**Marvin MANDEL, Governor of the State of Maryland, et al.**

v.

**UNITED STATES DEPARTMENT OF HEALTH, EDUCATION AND WELFARE, an Agency of the United States of America, et al.**

**MAYOR AND CITY COUNCIL OF BALTIMORE, a Municipal Corporation, and Board of School Commissioners of Baltimore City**

v.

**F. David MATHEWS, Individually and as Secretary of the United States Department of Health, Education, and Welfare, et al.**

Civ. A. Nos. N–76–1, N–76–23.

United States District Court, D. Maryland.

March 8, 1976.

As Amended March 25, 1976.

Francis B. Burch, Atty. Gen. of Md., Henry R. Lord, Deputy Atty. Gen., David H. Feldman, Walter G. Lohr, Jr., and George A. Nilson, Asst. Attys. Gen., Baltimore, Md., for plaintiffs, with the exception of Bd. of Trustees of the Community College of Baltimore in Civ.A. No. N–76–1.

Benjamin L. Brown, City Sol. of Baltimore City, Ambrose T. Hartman, Deputy City Sol., Blanche G. Wahl, Sp. Asst. City Sol., and William Hughes, Chief Sol., Baltimore, Md., for plaintiff Bd. of Trustees of the Community College of Baltimore.

Benjamin L. Brown, City Sol. of Baltimore City, William Hughes, Chief Sol., Elise J. Mason, Asst. City Sol., and E. Stephen Derby and Edward M. Norton, Jr., Baltimore, Md. (William L. Marbury, Baltimore, Md. of counsel), for Mayor and City of Baltimore and Bd. of Com'rs in Civ.A. No. N–76–23.

J. Stanley Pottinger, Asst. Atty. Gen., Civ. Rights Div., U. S. Dept. of Justice,

Alexander C. Ross, Leigh M. Manasevit and Teresa T. Milton, Attys., Civ. Rights Div., Washington, D. C. (Frank K. Krueger, Jr., Atty., Dept. of HEW, Washington, D. C., of counsel), for defendants, in both cases.

NORTHROP, Chief Judge.

## INTRODUCTION

These two separate actions were instituted by the plaintiffs, Marvin Mandel, Governor of Maryland, various State agencies, and educational institutions (in Civil Action No. N–76–1) and the Mayor and City Council of Baltimore and the Board of School Commissioners of Baltimore City (in Civil Action No. N–76–23) against the defendants, the Department of Health, Education and Welfare [hereinafter, HEW] and certain of its principal officers.[1] Plaintiffs seek issuance of preliminary injunctions to enjoin the defendants from pursuing further agency enforcement proceedings against plaintiffs pursuant to Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.* (1970), until defendants have fully complied with the mandates of the Act. Defendants counter that they have thoroughly complied with Title VI and also that issuance of injunction by this Court is barred at this time by two judicial doctrines: (1) exhaustion of administrative remedies, and (2) sovereign immunity.

Title VI, 42 U.S.C. § 2000d (1970) provides, as a broad policy, that no program or activity receiving federal funds shall be operated discriminatively:

No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

The State of Maryland receives approximately $65,000,000 presently from the Federal Government for operation of its institutions of higher education and many of the programs offered therein; the City of Baltimore receives approximately $23,000,000 from the Federal Government earmarked for its elementary and secondary schools. Defendants, after reviewing Maryland's institutions of higher education and the Baltimore City School System, concluded that each operated in violation of § 2000d in that vestiges of racial duality remained in the systems. Consequently, defendants initiated agency enforcement proceedings[2] against the City and further ordered a deferral[3] of all new federal financial assistance to the City. In Maryland's case, only issuance of a Temporary Restraining Order by this Court prevented defendants' initiation of similar enforcement proceedings and deferral against the State.

However, when Congress enacted the Civil Rights Act of 1964, it set forth in 42 U.S.C. § 2000d–1 (1970) elaborate guidelines governing the entire administrative process from initial agency contact with a recipient of federal funds to eventual fund cut-off:

Each Federal department and agency which is empowered to extend Federal financial assistance to any program or activity, by way of grant, loan, or contract other than a contract of insurance or guaranty, is authorized and directed to effectuate the provisions of section 2000d of this title with respect to such program or activity by issuing rules, regulations, or orders of general applicability which shall be consistent with achievement of the ob-

---

1. Due to the similarity of these cases, with resolution turning on identical legal issues and interpretation of the same statute, this Court will consider both herein, rather than rendering two duplicative decisions.

2. The administrative enforcement process is a system of administrative and judicial review, whereby, if discrimination is found to exist, cut-off of *all* federal assistance to the discriminating program or system is ordered.

3. Deferral of federal funds operates to immediately block any supplemental or new funds to existing programs or the establishment of new programs; the funds granted prior to deferral are unaffected by deferral and will continue at the same level even during deferral.

jectives of the statute authorizing the financial assistance in connection with which the action is taken. No such rule, regulation, or order shall become effective unless and until approved by the President. Compliance with any requirement adopted pursuant to this section may be effected (1) by the termination of or refusal to grant or to continue assistance under such program or activity to any recipient as to whom there has been an express finding on the record, after opportunity for hearing, of a failure to comply with such requirement, but such termination or refusal shall be limited to the particular political entity, or part thereof, or other recipient as to whom such a finding has been made and, shall be limited in its effect to the particular program, or part thereof, in which such noncompliance has been so found, or (2) by any other means authorized by law: Provided, however, that no such action shall be taken until the department or agency concerned has advised the appropriate person or persons of the failure to comply with the requirement and has determined that compliance cannot be secured by voluntary means. In the case of any action terminating, or refusing to grant or continue, assistance because of failure to comply with a requirement imposed pursuant to this section, the head of the Federal department or agency shall file with the committees of the House and Senate having legislative jurisdiction over the program or activity involved a full written report of the circumstances and the grounds for such action. No such action shall become effective until thirty days have elapsed after the filing of such report.

Herein lies the issue in controversy— did HEW comply with the statutory prerequisites of § 2000d–1, and if not, do the defenses asserted by defendants, *infra*, bar injunctive relief to compel compliance? [4]

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

■■ Before a plaintiff may successfully invoke the court's injunctive powers, the case must have reached a posture in which judicial intervention would be appropriate and effective. It is well-established that where an administrative procedure is statutorily prescribed, a plaintiff must exhaust all available administrative remedies before the court can properly review the matter. *See generally*, 3 K. Davis, *Administrative Law Treatise* § 20.01 et seq. (1958 ed., 1965 Supp.); L. Jaffe, *Judicial Control of Administrative Action* 424–58 (1965). In *Myers v. Bethlehem Shipbuilding Corporation*, 303 U.S. 41, 50–51, 58 S.Ct. 459, 463, 82 L.Ed. 638, 644 (1938) the Supreme Court recognized and reaffirmed "the long settled rule of judicial administration that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted."

Of course, like most judicial doctrine, exhaustion of administrative remedy is not absolute, but is subject to numerous exceptions.[5] Plaintiffs assert that two

---

**4.** Considerable publicity and emotion have been generated by these cases. Lest there be confusion, this Court wants to dispel any notions that this decision involves review of the desegregation efforts of either the State or the City. There will be absolutely no review of desegregation attempts or plans, no judicial usurpation of local educational functions, or no court-ordered bussing of children for desegregation purposes. This decision deals solely with a review of HEW's compliance or noncompliance with § 2000d–1 of Title VI.

**5.** *See United States v. Feaster*, 410 F.2d 1354 (5th Cir.), *cert. denied*, 396 U.S. 962, 90 S.Ct.

427, 24 L.Ed.2d 426 (1969), which comprehensively described three of the exceptions to the doctrine: (1) where there would be international repercussions resulting from the administrative proceedings, *citing McCulloch v. Sociedad Nacional de Marineros de Honduras*, 372 U.S. 10, 83 S.Ct. 671, 9 L.Ed.2d 547 (1963); (2) where a substantial violation to a plaintiff's constitutional rights has been shown, *citing, Fay v. Douds*, 172 F.2d 720 (2nd Cir. 1949); and, (3) where an agency acted in "brazen" defiance of its statutory authorization, *citing, Leedom v. Kyne*, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958).

such exceptions to the exhaustion requirement obtain herein, thereby allowing this Court to order the relief applicable. The first, and foremost exhaustion exception, was fashioned by the Supreme Court, in *Leedom v. Kyne*, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958). There, the Supreme Court permitted review of the NLRB's certification of a "bargaining unit" which included both professional and non-professional employees where the professional employees had not consented to the non-professional inclusion as expressly mandated by 29 U.S.C. § 159(b)(1) (1970). In fact, in direct contravention of Congressional provision, the NLRB arbitrarily refused to permit the professionals to vote for or against the inclusion. Upon this factual context, the Supreme Court rejected the agency's contention that the district court lacked jurisdiction and concluded that the district court in that instance had original jurisdiction:

> This suit is not one to "review," in the sense of that term as used in the Act, a decision of the Board made within its jurisdiction. Rather it is one to strike down an order of the Board made in excess of its delegated powers and contrary to a specific prohibition in the Act. * * * Plainly, this was an attempted exercise of power that had been specifically withheld. It deprived the professional employees of a "right" assured to them by Congress. Surely, in these circumstances, a Federal District Court has jurisdiction of an original suit to prevent deprivation of a right so given.

*Id.* at 188–89, 79 S.Ct. at 184, 3 L.Ed.2d at 214. The Court stated further:

> Here, differently from the Switchmen's case, "absence of jurisdiction of the federal courts" would mean "a sacrifice or obliteration of a right which Congress" has given professional employees, for there is no other means, within their control to protect and en-

force that right. And "the inference [is] strong that Congress intended the statutory provisions governing the general jurisdiction of those courts to control." This Court cannot lightly infer that Congress does not intend judicial protection of rights it confers against agency action taken in excess of delegated powers.

> Where, as here, Congress has given a "right" to the professional employees it must be held that it intended that right to be enforced, and "the courts * * * encounter no difficulty in fulfilling its purpose."

> The Court of Appeals was right in holding, in the circumstances of this case, that the District Court had jurisdiction of this suit, and its judgment is affirmed.

*Id.* at 190–91, 79 S.Ct. at 185, 3 L.Ed.2d at 215 [citations omitted].

Consequently, for the instant cases to fall within the purview of the *Leedom* exception (and the cases interpreting *Leedom*)[6] it must be proven that the agency acted clearly outside the provisions of Title VI.

The second exception to the exhaustion doctrine cited by plaintiffs derives principally from *Jewel Companies, Inc. v. FTC*, 432 F.2d 1155 (7th Cir. 1970). In *Jewel*, the United States Court of Appeals for the Seventh Circuit provided for district court review prior to an administrative hearing where the hearing and post administrative judicial review based on the record of that hearing would be inadequate to test inherent legal questions. The Court stated:

> If the question of the Commissioner's obligation is postponed until final appeal of a Commission order, the standard of review will be different. At that point the court of appeals would only decide whether the final order is supported by the evidence and would not question the authority of the Commission in issuing the complaint. As

---

**6.** *See e. g., American General Insurance Co. v. FTC*, 496 F.2d 197, 200 (5th Cir. 1974); *Pepsico, Inc. v. FTC*, 472 F.2d 179, 187 (2nd Cir. 1972); *Lee County School District Number 1 v. Gardner*, 263 F.Supp. 26, 31 (D.S.C.1967).

in Skinner & Eddy, [249 U.S. 557, 39 S.Ct. 375, 63 L.Ed. 772 (1919)] 'the so-called administrative remedy was without relevance to the plaintiff's claim.' The legal obligation of a Commissioner can be determined by the courts without delay and we think the proper approach is to allow such inherently legal attacks prior to an agency's final order.

*Id.* at 1159 [citations omitted]. *See* L. Jaffe, *Judicial Control of Administrative Action* 428 (1965). This rationale represents sound recognition that due process requirements and fundamental fairness would allow district court examination prior to what could be a long and necessarily ineffective agency process.

Consequently, in addition to the *Leedom* exception, if the questions presented herein involve matters not properly to be considered by the agency process, then this Court may intervene under the rationale of *Jewel.* We now look to the facts in both cases to determine whether each does or does not come within either exception.

Plaintiffs in both cases forcefully assert that the defendants unquestionably failed to comply with the express provisions of 42 U.S.C. § 2000d–1, thereby bringing into play the *Leedom* exception to the exhaustion of administrative remedies doctrine. Plaintiffs bottom this on two allegations: that defendants have totally refused to specify which "programs" in their systems are operated discriminatively in disregard of Title VI; and, that defendants did not in good faith, attempt to secure compliance by voluntary means as a prerequisite to initiating the agency hearing process.

## Voluntary Compliance

Title VI, as a prerequisite to initiation of the administrative process, compels an agency to secure compliance by voluntary means if possible.[7] In pertinent part, Title VI mandates that:

[N]o such action shall be taken until the department or agency concerned has advised the appropriate person or persons of the failure to comply with the requirement and has determined that compliance cannot be secured by voluntary means. . . .

42 U.S.C. § 2000d–1 (1970).

■ Doubtless, since the Act was in no way intended to be punitive or vindictive,[8] this provision compelling negotiation must be interpreted to further require that the agency pursue such compliance with good faith. The issue, therefore, narrows to whether HEW sought to achieve, in good faith, compliance by voluntary means.

## The State of Maryland

■ The first contact between the State of Maryland and the defendant, the Department of Health, Education and Welfare (and its Office of Civil Rights [hereinafter, OCR]) concerning implementation of the Civil Rights Act, Title VI, within the State, occurred early in 1969. (See Exh. 4 to Complaint, letter, March 12, 1969, Civil Action No. N–76–1). Negotiations thereafter began amicably, and on October 1, 1969, Maryland submitted its first plan to assure elimination of segregation. (Exh. 4 to Complaint, Civil Action No. N–76–1). HEW reviewed and, on January 30, 1970, rejected the plan, indicating that there were certain inherent "limitations" which precluded acceptance of the plan.[9]

---

**7.** In the Senate debates on the Civil Rights Act of 1964, Senator Humphrey, a sponsor of the Act, indicated that the agency was to end discrimination by any voluntary means and exhaust all avenues of cooperation before obtaining a fund cut-off:

[the] purpose of title VI is not to cut-off funds, but to end racial discrimination. . . . In general, cutoff of funds would not be consistent with the objectives of the Federal as-

sistance statutes if there are available other effective means of ending discrimination. . . .

110 Cong.Rec. 6544 (1964).

**8.** *See* 110 Cong.Rec. 7059 (1964) (remarks of Senator Pastore.)

**9.** Though HEW complimented the State for its overall efforts to improve its system, HEW found the plan's school-by-school approach

Subsequently, Maryland revised the original plan and submitted, on December 1, 1970, a second, more comprehensive plan with statewide emphasis as requested by the defendants.[10] For over two and one-half years no formal acceptance or rejection was registered by defendants. Consequently, the State implemented the plan in the belief that it was acceptable. It was not until 1973, after Maryland had expended considerable resources in effectuating the plan, that defendants reviewed the 1970 plan and rejected it,[11] apparently due to prodding from Judge Pratt of the United States District Court for the District of Columbia.[12]

Thereafter, relations became increasingly strained between the parties, but nevertheless, negotiations continued.[13] On February 5, 1974, Maryland presented HEW with what was to become its final desegregation plan to date. (Exh. 20 to Complaint, Civil Action No. N–76–1). On June 21, 1974, HEW, by "Mailgram," accepted the plan without reservation[14] and Maryland immediately began implementation under the aegis of the defendants. Until August 7, 1975, implementation of the plan proceeded unabated.[15] On that day, in what has been characterized as a "terrible letter,"[16] Dewey Dodds, Regional Director of OCR accused the State of failing "to implement, or [to] have only partially fulfilled most of the commitments made in the State plan." (Exh. 34 to Complaint, at 2, Civil Action No. N–76–1) The letter also presented seven pages of demands which were to be accomplished in an apparently unreasonable period of time.[17]

lacking and suggested that rather than aim their efforts at individual institutions, plaintiffs should take a statewide approach. *See* Exh. 5 to Complaint, Civil Action No. N–76–1.

**10.** *See* Exh. 7 to Complaint, Civil Action No. N–76–1. At this time there continued to be a good faith spirit of cooperation between the parties. At the hearing in this Court of February 2, 1976, Lieutenant Governor Blair Lee testified concerning that plan:

[W]e tried our hand at a second plan, again working with Dr. Severinson and the other people from the Department and the second version attempted to make it more systemwide, I think, and to really sort of flesh out and make more specific the content of the original plan and that—and, again, they were looking over our shoulder pretty much all the way and that was submitted to the Department I believe on December 1st, 1970.

Tr. at 363.

**11.** *See* Exh. 11 to Complaint, letter, May 21, 1973, Civil Action No. N–76–1.

**12.** *See Adams v. Richardson*, 356 F.Supp. 92 (D.D.C.1972), wherein HEW was ordered to assume a more active role in enforcing Title VI in certain states, including Maryland.

**13.** At this juncture it must be noted that, as to be described later, Maryland repeatedly sought information in regard to what Maryland should do to submit an acceptable plan. *See e. g.,* Exh. 12 to Complaint, letter from Governor Marvin Mandel, May 30, 1973, Civil Action No. N–76–1.

**14.** *See* Exh. 25 to Complaint, Civil Action No. N–76–1. Mr. Peter Holmes, the Director of the Office of Civil Rights, forthrightly assured that "there [was] no qualification of the acceptance of the Plan." Deposition, Peter E. Holmes, at 120.

**15.** There were, however, certain noteworthy activities in this period which need to be mentioned. First, on December 11, 1974, defendants sent a letter to plaintiffs propounding a vast array of questions again questioning the plan. (Exh. 28 to Complaint, Civil Action No. N–76–1). Plaintiffs contend that this represented a renewed attack on the plan and that it constituted a de facto revocation of the prior approval. Also, during that period, Maryland submitted its first annual report (Exh. 29 to Complaint, Civil Action No. N–76–1) and the first mid-year status report (Exh. 33 to Complaint, Civil Action No. N–76–1) detailing the progress obtained under the plan.

**16.** Lieutenant Governor Lee, at the January 1976 hearing, indicated that this letter directed to the Governor of Maryland was a "terrible letter" (Tr. at 370) that employed the most "peremptory kind of language" possible (Tr. at 371).

**17.** Certain of the times specified were so outrageous that this Court fails to understand how the defendants could have realistically expected they be accomplished. For example, the letter provided 60 days for reform and implementation of the financial aid program in the State. What HEW obviously neglected to consider was that the State, as well as devising and preparing a new system, would have had to obtain approbation from the State Legislature which was not in session during any part of the 60-day period—an action close to impossible.

Governor Mandel, in a letter of August 13, 1975, rejected out-of-hand the accusations contained in the letter of August 7th and labelled the communication "a clumsy effort at intimidation" which must be "viewed as a unilateral repudiation by the Office for Civil Rights of the Plan itself and of OCR's approval of it a year ago." (Exh. 35 to Complaint at 1, Civil Action No. N–76–1). Subsequently, this matter came to the attention of David Mathews, Secretary of the Department of Health, Education and Welfare, who, concerned about the precipitous nature of the August 7th letter, contacted Lt. Governor Lee to "get the show back on the road." [18] That conversation resulted in two meetings between Maryland officials and HEW personnel. At the first, held in mid-September with Lt. Governor Lee and Colonel Mann, Special Assistant to Secretary Mathews, in attendance, the "arbitrary and irrational demands" of the August 7th letter were discussed (Tr. at 374). There, Colonel Mann "agreed with [Lt. Governor Lee] as to the tone of the letter, that it was totally inappropriate. . . ." (*Id.*) On September 24, 1975, there was a second, larger meeting, attended by Lt. Governor Lee, Colonel Mann, Peter Holmes (Director of OCR), Dr. Sheldon Knorr (Executive Director of the Maryland Council for Higher Education), and a number of special assistants to Secretary Mathews. Lt. Governor Lee described this meeting as follows:

> [T]he main thrust of the meeting was aimed at carrying out Secretary Mathews' original idea of getting the show back on the road which would consist of a meeting of the minds between the two principals, the Department and the State, as to priorities and really what they wanted of us and the extent to which we could comply and when . . . . [T]hey were— seemed entirely willing to withdraw the August 7th letter, at least Colonel Mann and some of the others were.
>
> Mr. Barrett, the attorney, with one eye very obviously on the Adams case suggested that it not be a withdrawal for fear of feeding ammunition to the Plaintiffs in that case and so we all agreed that the August 7th letter should be held in abeyance and it was agreed that there would be another meeting at staff level to get things going again.

Tr. at 376.

To those in attendance at this meeting, it was apparent that voluntary compliance efforts unquestionably had been reinstituted in earnest and that negotiations would resume in full.[19] Shortly thereafter, Peter Holmes, acknowledging the matters agreed upon at the meeting, informed plaintiffs that the Department would hold in abeyance the time frames set forth in the August 7th letter for accomplishing specific steps in the plan. (Deposition, Holmes, at 161).

According to the hearing testimony, for a brief period optimism reigned in the State, and it was believed that the defendants actually wanted to pursue voluntary compliance. On October 1, 1975, Dr. Knorr and other representatives of the Maryland Council for Higher Education met with HEW's employees in Philadelphia to resolve any areas of disagreement. There, plaintiffs were left with the impression that "the ball was in HEW's court" (Tr. at 378) and that

---

**18.** Testimony of Lieutenant Governor Lee, Tr. at 373.

**19.** Dr. Knorr's recollection of the meeting was similar to Lt. Governor Lee's:

> We talked about in general how we could proceed from that point forward to work together toward implementing the plan in a voluntary way and I might say that that meeting was the only positive point in my involvement in this whole process beginning July 1, that I left that meeting with an understanding that *we were finally on the right track, that we were going to get an understanding of what we had been doing and where we were going to go from that point.*

Tr. at 316 [emphasis added].

HEW was to communicate with the State further. As Dr. Knorr observed:

My understanding at least was that they were going to take under advisement all that we had provided, consider the process that I had talked about in terms of priority, and a last item in the meeting was we'll be back in touch.

You know, we expected subsequently to hear something from OCR in this regard. . . .

. . . The next move was up to OCR and it was a clear understanding that they were going to contact us.

Tr. at 323–24.

Not until December 15, 1975, when the State received a startling letter from Martin Gerry, the new Acting Director of OCR, did Maryland receive any formal communication from the defendants. This letter did not offer guidance as the State had been expecting, but rather informed Governor Mandel that Maryland had "failed to implement or have only partially fulfilled most of the commitments made in the State Plan." (Exh. 36 to Complaint, Civil Action No. N–76–1). The communication from Gerry concluded that agency enforcement proceedings were to be implemented:

Based on a review of the total record, as the responsible Department official, I have determined pursuant to Section 80.8(c)(1) of the Department's Regulation that the State of Maryland, its agencies and its state-operated institutions of higher education are not operating in compliance with Title VI of the Civil Rights Act of 1964, and OCR has exhausted the possibilities of compliance through informal conferences and other voluntary means. Therefore, I have referred this matter to the Department's Office of General Counsel and requested that it initiate formal administrative enforcement proceedings against the State of Maryland.

Exh. 36 to Complaint, at 3, Civil Action No. N–76–1. Additionally, the defendants were not satisfied by merely informing the State of this decision, but called a press conference to announce what was described as the "consistent failure of the State's higher education institutions to comply with the provisions of a Statewide desegregation plan accepted by [the] Department in June, 1974. . . ." (Exh. 37 to Complaint, at 2, Civil Action No. N–76–1).

The foregoing chronology raises serious doubts concerning whether the defendants sought, in good faith, compliance by voluntary means. The record is somewhat curious in that HEW, rather than negotiating compliance, seemingly *chose to foreclose* voluntary compliance by precipitously casting the negotiations into what is, in effect, an adversary proceeding.

Before this Court is willing, however, to draw further conclusions from the events, it must consider another important aspect of the voluntariness issue— plaintiffs' assertion that defendants consistently refused to specify the steps necessary to obtain voluntary compliance.

Plaintiffs contend that defendants have never specified, and in fact, have consistently refused to specify, actions which plaintiffs could take in order to facilitate compliance with Title VI. The record bears witness to the absolute dearth of definitive standards provided by defendants, as well as the numerous requests for guidance by the plaintiffs. As early at 1970, the State, without apparent success, sought to determine what basis HEW employed to evaluate the State's system and how specifically it could comply with Title VI. (Exh. 6 to Complaint, Civil Action No. N–76–1). This was described by Lt. Governor Lee, at the January 30 hearing:

When this whole matter first started, when the first letter came in March of 1969, there was absolutely no problem, no conflict of thoughts and ideas and desires as far as the State of Maryland is concerned, and this is not a backward state or a red neck state.

It was our desire to comply with Title VI in every way, in every way that made sense, as long as it didn't

involve literally destroying our higher education system.

And we have been, from the beginning, anxious to do what we conceive Title VI to be all about and we had worked very closely with Dr. Severinson toward that end . . . . But then began this incredible *zig zag course,* this pursuit of a moving target, sometimes an almost invisible target, where the Department simply wouldn't tell us what they wanted or wouldn't tell us in words that could be translated into a plan in the real world and their erratic changes of course and changes of pace, of speed, made it very difficult for the State.

Tr. at 387–88 [emphasis added].[20]

This "zig zag" course, as described by the Lieutenant Governor, permeates the entire record of the defendants' dealings with Maryland. At most, in response to plaintiffs' queries, defendants made only sweeping generalizations concerning what they sought. Typically, when asked for specifics, defendants often responded with broad sweeping phrases, such as, eliminate all vestiges of racial duality or eliminate all racial identifiability, but gave no specifics on how this was to be accomplished.[21]

Moreover, much of the State's confusion derived from HEW's perplexing and conflicting use of statistics. Lieutenant Governor Lee testified to the defendants' contradictory application of statistics:

There was a continuing absence of firmness as to the significance of the numbers. Whenever the Department made a Complaint that the State was not doing right, in their eyes, they seemed to base it on the numbers, on the racial composition in the several institutions. But if you ask them whether the numbers were important, they would say no . . . . And then we would ask them how do you measure the results of the process that they were so interested in, aimed at eliminating racial identifiability, and they'd say—then you'd come back to the numbers, the only way you can measure the success, the result, the only way you can quantify the success is by looking at the numbers, the racial composition. But the numbers, mind you, are not important . . . .

Tr. at 366–67.

Evidenced throughout the entire course of dealings are myriad examples of defendants' duplicitous posture in regard to statistics. While repeatedly denying that their decisions were based on statistics,[22] the defendants nevertheless

---

**20.** Governor Mandel also observed this problem:

> Beyond that [the general prohibition against discrimination in Title VI], the Federal Courts and HEW have done no more than make vague references to "dismantling" the former dual systems and "eliminating racial identifiability" of the institutions.
> . . . We are willing to make reasonable amendments to our plan subject to firm information as to the ultimate target.

Exh. 12 to Complaint. See also Exh. 22 to Complaint, letter, Wesley Dorn, Chairman, Governor's Task Force, Civil Action No. N–76–1.

Dr. Day, Vice Chancellor for Academic Planning and Policy at the University of Maryland also recognized the problems:

> I didn't have the foggiest idea what kind of checkpoints to place so [the Task Force] just did what we thought was right in conscience and law . . . .

We didn't get any help from HEW.

. . . . .

No, sir [we never knew what HEW expected]. Still don't.
Tr. at 266–67, 277.

**21.** An explanation (if not *the* explanation) for defendants' refusal to supply specifics may be gleaned from a memorandum of November, 1969, written by defendant Gerry to the then director of OCR, wherein Gerry stated:

> [I]t would seem prudent to place the burden for developing a plan on the State. If we make specific suggestions we are as a practical matter stuck with them, whether they "work" or not.

Plaintiffs' Exh. 2, Civil Action No. N–76–1.

**22.** In his deposition of January 20, 1976, defendant Taylor illustrated this in the following exchange:

> I further recall that I informed the staff at that time that while we would welcome re-

consistently explicated Maryland's violation of Title VI by citing statistics. For example, Peter Holmes, by letter of May 21, 1973, which informed plaintiffs of the State's violation of Title VI, indicated a marked reliance on statistics:

> In appraising whether vestiges of the dual higher education system remain in Maryland, we have considered first the statistics which you have supplied concerning both faculty and students. . . .
>
> . . .
>
> The present disparities in the racial composition of the faculties and student bodies among the various institutions in the Maryland State system of higher education appear clearly attributable to the existence of the prior dual system based on race. Accordingly, we must conclude that the dual system has not been fully disestablished.

Exh. 11 to Complaint, at 1, 4, Civil Action No. N–76–1. Another striking example is set forth in the December 15, 1975 letter to Governor Mandel from defendant Gerry, wherein defendants couch Maryland's non-compliance almost totally in terms of statistics:

> More serious than Maryland's failure to implement its plan is the segregation which continues to exist at the post secondary institutions throughout the State. The information Maryland provided OCR in the First Annual De-

segregation Status Report, February 1975, shows that the percentage of black students at the predominantly black colleges in the State system was 86.9 in 1974, while the percentage of black students at the predominantly white senior institutions was 7.4 for the same year. *These figures clearly reveal that the State is continuing to operate a dual system of higher education.*

Exh. 36 to Complaint, at 3, Civil Action No. N–76–1 [23] [Emphasis added].

In addition to statistics, defendants left another extremely perplexing problem unresolved—whether institutions with black traditions could be permitted to continue to preserve that identity. Early in the negotiations, Lt. Governor Lee posed this disturbing question:

> Morgan State College is academically superior to many of the predominantly white colleges in HEW's Region III. . . . If you eliminate Morgan's racial identifiability, you also eliminate one of the black community's proudest symbols. Must this be done in the name of extending civil rights?

Exh. 6 to Complaint, at 2, Civil Action No. N–76–1. Unfortunately, defendants did not offer a consistent answer to such queries stating on one hand that "the department . . . has no objection to institutions that were predominantly

---

ceipt of the statistical data, that it was in no way a substitute for the information on the actions and processes to implement the Plan, and that that, the latter information, would be the major focus of our evaluation of the implementation of the Plan.

Q Do I correctly interpret what you are saying that you told the Maryland Council for Higher Education that a preliminary statistical presentation was not what HEW was looking for?

A Yes, we told them that.

Deposition, Taylor, at 13.

Peter Holmes also, by letter of June 6, 1973 to Governor Mandel, depreciated the value of statistics:

> We have not established specific numerical indices to determine when a dual system

of higher education has been disestablished. . . . In addition, since the selection of an institution of higher education is made by individual students, a practice which need not be changed to meet our requirements, it is not possible to project the racial composition of colleges with precision.

Exh. 13 to Complaint, at 3, Civil Action No. N–76–1.

23. While the Court will refrain from passing on the merits of Maryland's compliance, or lack of compliance, we must note the irony of defendants' use of *these* statistics to prove violation of Title VI since there is undisputed testimony that the numbers are "right on track" with the numerical goals established under the plan considered and approved by defendants. Tr. at 249–51, 258 (testimony of Dr. Day).

black in racial composition,"[24] while on the other hand criticizing the State on its failure to "eliminate all vestiges of racial identifiability." Counsel for defendants even recognized the enormous problem posed by this issue. When asked by the Court to comment on the testimony of Dr. Billingsley, President of Morgan State University, that HEW was bent on elimination of predominantly black institutions in Maryland, counsel responded:

> Well, Your Honor, there is no truth to the fact that we are trying to eliminate the black institutions. What we are trying to do is to eliminate the identifiability as black institutions of the black institutions. . . .
>
> . . .
>
> Your Honor, this is a difficult concept and we acknowledge that it's not an easy concept. . . .
>
> It's not an impossible concept though.

. . .

Tr. at 154–55.

Dr. Day testified extensively to the irreconcilable problems implicit in effectuating elimination of racial identifiability, while preserving the character of the black institution:

> I was very worried . . . about you might call the arithmetic of the numbers, the inconsistent arithmetic, how you could move black students into the historically white institutions without seriously changing the number of black students in the black colleges.
>
> We didn't get any guidance on that at all. Tr. at 242. Confronted with this apparently insurmountable dilemma, defendants offered little concrete support. That which was proffered was rather quizzical:
>
> I remember one guidance we got from Mr. Taylor at that meeting [on July

24, 1973] was, well, that was a problem [the arithmetic] but maybe the solution was that Maryland would bring a lot of black students in from other states. And that just struck me as unreal. . . . [S]omehow, he didn't understand the issue.

Tr. at 273–74.

Though the foregoing only presents abbreviated examples of defendants' arbitrary behavior, it nevertheless illustrates HEW's obvious refusal to act with good faith and cooperation. Repeatedly, plaintiffs sought specifics as to why they were in violation of Title VI and what could be done to rectify the situation, but their efforts were of no avail. This intentional, systematic behavior of the defendants belies any assertion that they sought compliance in good faith by voluntary means. In fact, this behavior almost completely precluded voluntary compliance since, doubtless, it is nearly impossible to comply with standards that are unknown.

In light of defendants' arbitrary, and somewhat cavalier, behavior, as well as the precipitous termination of negotiations, there is but one conclusion to be drawn—that defendants refused to seek, in good faith, compliance by voluntary means. Consequently, this Court must conclude that defendants' activities stood patently in violation of the prescriptions of Section 2000d–1.

### City of Baltimore

Many facets of HEW's conduct in regard to Maryland are applicable to the within consideration of HEW's dealings with Baltimore City. There is one important additional factor, however, that alters Baltimore's situation somewhat from the State's—a pamphlet published by defendants' Office of Civil Rights which governs HEW's enforcement of

---

24. Deposition, Peter Holmes, at 46. Defendants' official position was that black institutions could maintain their unique character, however, within HEW there was much sentiment to "make all colleges majority white quickly" and to "approximate the ratio of black and white students in the State as a whole who attend college." Plaintiffs' Exh. 1, Memorandum of Lloyd R. Henderson, Chief of Education Branch of OCR, Civil Action No. N–76–1.

Title VI in the elementary and secondary school systems. The pamphlet, entitled *Policies on Elementary and Secondary School Compliance with Title VI of the Civil Rights Act of 1964,* in pertinent part indicates firm policy strictures applicable to Title VI compliance efforts:

Where review of a school system indicates noncompliance with the Assurance of Compliance and Title VI, the Office for Civil Rights staff *will make every reasonable effort to achieve compliance through negotiation.*

The first formal step of such negotiation is a letter from the Office for Civil Rights to the school system identifying the particular areas of noncompliance, advising the system of its responsibility to prepare and submit to the Office for Civil Rights a plan for correcting the noncompliance promptly and effectively, and offering the school system assistance and guidance on the best manner to achieve compliance. If a school system submits a plan which is unsatisfactory in any respect, the Office for Civil Rights *will inform the school system in detail and in writing of the areas in which the plan is not satisfactory.*

If local officials so request, the Office for Civil Rights will at any stage of negotiation recommend in writing specific steps the school system may take to achieve compliance.

Pamphlet, at ¶ 22 [Emphasis added].

■ In view of this forceful policy statement, less than complete cooperation and written specification by defendants in the instant case would be a failure to comply with Title VI. Defendants' actions must comport with the pamphlet for it is a well-established precept that governmental agencies must scrupulously conform to their own rules and authorizing statutes. *Service v. Dulles,* 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957); *United States ex rel. Accardi v. Shaughnessy,* 347 U.S.

260, 74 S.Ct. 499, 98 L.Ed. 681 (1954); *United States v. Heffner,* 420 F.2d 809 (4th Cir. 1970); *Equal Employment Op. Comm'n. v. Western Electric Co., Inc.,* 382 F.Supp. 787 (D.Md.1974). As the United States Court of Appeals for the Fourth Circuit stated, in *Heffner*:

An agency of the government must scrupulously observe rules, regulations, or procedures which it has established. When it fails to do so, its action cannot stand and courts will strike it down.

420 F.2d at 811.

In 1973, defendants were ordered, in *Adams v. Richardson, supra,* to determine whether there existed violations of Title VI within the Baltimore City school system. After obtaining considerable information from plaintiffs concerning the school system, Peter Holmes, on February 5, 1974, indicated that "further desegregation of Baltimore Schools [was] necessary and feasible" and requested a "plan for further student and faculty desegregation" from plaintiffs. (Exh. A to Complaint, Civil Action No. N–76–23). In June 1974, the City submitted the requested plan, which defendants, by letter of July 29, 1974, declared was in violation of Title VI. Defendants also, by that letter, threatened administrative enforcement action. (Exh. B to Complaint, Civil Action No. N–76–23). Thereafter, plaintiffs submitted a new plan, but that plan also, according to the defendants, did not comport with Title VI and therefore, was on August 23, 1974, rejected. (Exh. D to Complaint, Civil Action No. N–76–23).

The letter of August 23, 1974, has considerable importance to the within examination because it illustrates the emergence of behavior by defendants which must properly be labelled arbitrary. In that letter defendants notified plaintiffs that administrative enforcement proceedings were to be immediately commenced against the City;[25] and that

**25.** See Exh. E to Complaint, Civil Action No. N–76–23, Notice of Opportunity for Hearing, September 9, 1974, wherein the process was actually initiated.

compliance could not be effectuated by voluntary means. Then, in an ostensibly contradictory fashion, defendants sought further material from plaintiffs—a "pupil locator map"—which defendants stated would be "a *basis* for considering the feasibility of further remedies to maximize desegregation in [the] system." [Emphasis added]. Moreover, the letter stated further:

I am merely requiring that you implement your proposed pairings as an interim measure until you provide the information requested in Step (2). *Only then can this Office have a factual basis on which to rationally analyze remedies for further elementary desegregation.*

*Id.* at 3 [Emphasis added].

This letter reveals the schizophrenic posture being assumed by the defendants. On one hand, defendants were willing to cast this into the long, exhaustive administrative enforcement process, seemingly due to their inability to secure compliance by voluntary means, while on the other hand, defendants sought additional information in order to allow proper analysis of the system. With defendants themselves acknowledging their lack of sufficient basis to fashion a remedy, how could it conceivably be argued that compliance by voluntary means could not be secured? It would appear that only if the plaintiffs refused to provide the sought-after information would it be appropriate to initiate enforcement proceedings prior to resolution of such important underlying issues. But this is not the case here, as even Holmes admitted "[t]he Baltimore School System also [always] indicated a desire to work with the Office for Civil Rights. . . ." (Deposition, Holmes at 43).

Consequently, as early as 1974, HEW disregarded the requisites of Title VI as well as its own policy statement by choosing not to pursue reasonable compliance efforts with the admittedly cooperative City.[26] By initiating enforcement proceedings at that juncture, defendants prematurely altered the relation of the parties from partners to adversaries, thereby severely diminishing the possibility of voluntary compliance.

Nevertheless, the City thereafter continued to pursue its efforts toward voluntary compliance. In early 1975, plaintiffs submitted proposed desegregation plans for its high schools (Exh. H to Complaint, Civil Action No. N–76–23), faculty (Exh. J to Complaint), and junior high schools (Exh. K to Complaint). Dr. Patterson, then Superintendent of Baltimore City Schools, reiterated the City's desire to work promptly and vigorously "along with defendants to insure the implementation of suitable plans." (Exh. G to Complaint, at 1 Civil Action No. N–76–23). Shortly thereafter, on May 2, 1975, HEW sent plaintiffs a long-awaited evaluation and critique of the plans the plaintiffs had proffered. This evaluation concluded that the plans were not sufficient to satisfy Title VI. (Exh. L to Complaint, Civil Action No. N–76–23). However, defendants chose not to grant the City time to rectify the deficiencies in the plans but immediately established a date for the administrative enforcement hearing to begin and also ordered the "deferral" of funds.[27] To this, the City replied "we regret that Baltimore City was not given the opportunity to respond to your specific concerns before your office sought an administrative hearing," but nevertheless, offered again to meet with defendants to facilitate voluntary compliance. (Exh. M to Complaint, at 1, Civil Action No. N–76–23).

The foregoing graphically evidences repeated disregard of defendants to comply with the letter and spirit of Title VI, as well as its own policy statement. De-

---

26. Much of the testimony elicited by plaintiffs at the January 1976 hearing bolstered plaintiffs' contention that the City sought to cooperate with HEW unhesitantly. *See e. g.,* Tr. at 65, wherein William Schaefer, Mayor of Baltimore, testified: "[s]o I can unequivocally say

as far as I am concerned every effort to negotiate and comply is being made and has been made."

27. See note 3, *supra.*

fendants knowingly foreclosed viable avenues of negotiation while invoking the enforcement process and ordering deferral, thereby destroying the essence of voluntary negotiation. Furthermore, review of HEW's dealings with the City reveals a cavalier and arbitrary posture by HEW toward plaintiffs' requests for specificity in defining deficiencies and suggesting improvements. Plaintiffs continually sought guidance from HEW. To cite one example, Dr. Patterson in a letter of January 20, 1975, attests to HEW's lack of definitive standards when attempting to explain the City's inability to take "specific measures" to correct deficiencies in their program:

> [W]e hope that you will be willing to describe in detail each deficiency which you believe exists, to explain what you believe must be accomplished to correct each deficiency, and to suggest measures which you believe would work to overcome the asserted deficiencies. Only then will the Board be in a position to respond to your request for "specific measures"; whereas, as matters now stand, the Board is at a loss to understand precisely what measures you feel should be taken to change the plan now in effect for faculty and at the elementary and seventh grade levels.

Exh. G to Complaint, at 2, Civil Action No. N–76–23.[28]

Subsequent to plaintiffs' numerous requests, defendants finally offered the City some indication of deficiencies in its program. (Exh. L to Complaint, letter, May 2, 1975, Civil Action No. N–76–23). But even there, when questioned later as to whether the letter was intended to comprehensively outline the City's violations, HEW replied that it merely "enumerated examples of inadequacies" and "was not intended as an enumeration of all possible inadequacies of those plans."

(Exh. O to Complaint, at 3, Civil Action No. N–76–23, Response of HEW for Admissions). Hence, since defendants admit that this letter, presented finally to apprise plaintiffs of the City's deficiencies, was in itself inconclusive and incomplete, there is but one conclusion to be drawn—that defendants failed to "inform the school system *in detail and in writing* of the areas in which the plan is not satisfactory." (*See* pamphlet, at ¶ 22).

Though this decision necessarily outlines only a portion of defendants' activities, this Court notes that there is an abundance of evidence which, taken together, forms a consistent pattern of defendants' duplicitous and uncooperative behavior. Defendants have overwhelmingly refused to negotiate in good faith, afforded scant specificity and guidance to assist the City, and repeatedly declined to pursue voluntary compliance. Rather, defendants have sought to bludgeon compliance through initiation of unwarranted and premature enforcement procedures. This Court must accordingly declare that defendants' actions were in brazen defiance and in direct contravention of Title VI and paragraph 22 of defendants' own policy statement.

## PROGRAM–BY–PROGRAM APPROACH

■ There is much authority for the proposition that Title VI requires HEW to employ a program-by-program analysis when reviewing federally funded institutions. On this point, Title VI specifically states:

> Compliance with any requirement adopted pursuant to this section may be effected (1) by the termination of or refusal to grant or to continue assistance under such program or activity to any recipient as to whom there

---

**28.** There are myriad examples of HEW's failure to offer guidance to the City. Overwhelmingly, at the January 1976 hearing, plaintiffs' witnesses testified to having no idea of what HEW demanded. *See e. g.*, Tr. at 35–36, testimony of Grover McCrea, member of Board of School Commissioners of Baltimore City; Tr. at 47, testimony of Sheila Sachs, also School Board member.

has been an express finding on the record, after opportunity for hearing, of a failure to comply with such requirement, but such termination or refusal shall be limited to the particular political entity, or part thereof, or other recipient as to whom such a finding has been made and, *shall be limited in its effect to the particular program, or part thereof*, in which such noncompliance has been so found  . . . .

42 U.S.C. § 2000d–1 (1970) [Emphasis added].

The Fifth Circuit in *Board of Public Instruction v. Finch*, 414 F.2d 1068 (1969), considered whether the cited statutory language requires a programmatic approach. The court sharply rejected defendants' non-programmatic argument, that defects in one part of the system automatically infect the whole:

> We note finally that the purpose of the Title VI cutoff is best effectuated by separate consideration of the use or intended use of federal funds under each grant statute. If the funds provided by the grant are administered in a discriminatory manner, or if they support a program which is infected by a discriminatory environment, then termination of such funds is proper. But there will also be cases from time to time where a particular program, within a state, within a county, within

a district, even within a school (in short, within a "political entity or part thereof"), is effectively insulated from otherwise unlawful activities. Congress did not intend that such a program suffer for the sins of others. HEW was denied the right to condemn programs by association. The statute prescribes a policy of disassociation of programs in the fact finding process. Each must be considered on its own merits to determine whether or not it is in compliance with the Act. In this way the Act is shielded from a vindictive application. Schools and programs are not condemned enmasse or in gross, with the good and the bad condemned together, but the termination power reaches only those programs which would utilize federal money for unconstitutional ends. Under this procedure each program receives its own "day in court."

*Id.* at 1078.

The legislative history of Title VI supports this reading.[29] A whole system is not to be considered infected by a violation of one of its components, for as Senator Pastore stated during Senate debate:

> Once the policy is set, there are many, many ways in which intervention could be had, so as not to do an

---

**29.** Senator Humphrey, speaking for the bill, stated:

Some Senators have expressed the fear that in its original form Title VI would authorize cutting off of all federal funds going to a state or a particular program even though only one part of the state were guilty of racial discrimination in that program. And some Senators have feared that the title would authorize cancelling all federal assistance to a state if it were discriminating in any of the federally assisted programs in that state.

As was explained a number of times on the floor of the Senate, these interpretations of Title VI are inaccurate. The title is designed to limit any termination of federal assistance to the particular offenders in the particular area where the unlawful discrimination occurs. Since this was our intention, we have made this specific in the provisions of Title VI by adding language to 602 to

spell out these limitations more precisely. This language provides that any termination of federal assistance will be *restricted to the particular political* subdivision which is violating non-discrimination regulations established under Title VI. It further provides that the termination shall affect only the *particular program, or part thereof*, in which such a violation is taking place.

88 Cong. Rec. 8627 (1964) [Emphasis added]. Senator Javits also noted that:

Proponents of the bill have continually made it clear that, apart from all these safeguards against arbitrary action, it is the intent of Title VI not to require wholesale cutoffs of federal funds from all federal programs in entire states, but instead to require a *careful case by case* application of the principle of non-discrimination *to those particular activities* which are actually discriminatory or segregated. . . .

*Id.* at 7103 [Emphasis added].

injustice to a great multitude because of the instance of only one offender.

We ought to make that very clear in the history we are making here today. We are not seeking to penalize people by way of pressure and saying that we can cure this one case if we twist the arms of 99 people. That is not the purpose of the section. We are not trying to bring compliance through pressure. We are trying to bring voluntary compliance.

110 Cong.Rec. 7061 (1964).

Defendants have admitted that in both cases, they did not focus on particular federally financed programs or institutions.[30] Defendants contend that, though Title VI does require a program-by-program analysis, such an examination need not be conducted until the administrative hearing, wherein the agency must "specifically identify the Federal financial assistance going directly to the . . . program or infected by the discriminatory environment which exist in the program." (Defendants' Post-Hearing Memorandum, at 19, Civil Action No. N–76–23). Plaintiffs, in each case, counter that the programmatic analysis must be conducted prior to the enforcement hearing, during voluntary compliance efforts. Hence, this Court is presented with a novel issue, which this Court believes is one of first impression—at what stage must an agency assume a programmatic approach?

Plaintiffs offer numerous compelling reasons in support of their contention. The first, and possibly most persuasive, is the inherent futility of attempting to secure voluntary compliance of Title VI in a major system where the offending program is unknown. It is paradoxical to assume that a recipient of federal funding, such as a state or a large city, could rectify any discriminatory programs within its system without ever being informed which program was considered by HEW to be operating discriminatively. Consequently, a statewide or citywide approach to enforcement of Title VI is, doubtless, not conducive to compliance by voluntary means and, in all likelihood, contrary to Congressional non-vindictive intent.

Other reasons come to the fore which, likewise, suggest that plaintiffs' reading of Title VI in this regard is a proper one. As will be developed *infra,* in both the State system and the City system there are multitudinal programs receiving federal financing which, due to the non-programmatic approach assumed, are being condemned by defendants en masse. In Baltimore City alone there are seventy-five programs serving such diverse concerns as sickle cell anemia research and remedial summer programs for students,[31] while in its State counterpart, there is federal funding to programs within twenty-eight institutions of higher education ranging from a unique cancer research center to the student work study program.[32] To compel all of these programs, regardless of whether or not each is discriminatory, to prepare a defense and endure protracted enforcement proceedings is wasteful, counterproductive, and probably inimical to the interests of the very persons Title VI was enacted to protect. It is far more equitable, and more consistent with Congressional intent, to require program delineation prior to enforcement hearings than to include all programs in enforcement proceedings. As the Fifth Circuit observed in *Board of Public Instruction v Finch, supra,* "a program [should not] suffer for the sins of others." 414 F.2d at 1078.[33]

---

**30.** For HEW's lack of programmatic review of Maryland, *see e. g.,* Deposition, Holmes, at 197–99. For Baltimore City's, *see e. g.,*Tr. at 130 (testimony of Harold Davis).

**31.** *See,* Plaintiffs' Reply Memorandum to Defendants' Post-Hearing Memorandum, at 18, Civil Action No. N–76–23.

**32.** *See,* Plaintiffs' Post Trial Memorandum at 8–9, Civil Action No. N–76–1.

**33.** Remarks of Senator Pastore on the floor of the Senate would seem to add Congressional support to this view. He noted that by Title VI, Congress was "not seeking to penalize people by way of pressure and saying that we can cure this one case if we twist the arms of 99 people." 110 Cong.Rec. 7061 (1964).

Consequently, this Court concludes that, in the interest of justice, Title VI demands a program-by-program breakdown *prior* to enforcement proceedings (during voluntary compliance efforts). Since defendants have conducted no such examination, defendants have not complied with mandates of Section 2000d–1.[34]

In light of the foregoing rather extensive exposition describing HEW's failure to act in accordance with § 2000d–1, this Court is of the opinion that these cases fall squarely within the purview of the exception to the doctrine of exhaustion of administrative remedies enunciated in *Leedom v. Kyne, supra.* HEW acted with palpable disregard of the statutory prerequisites, often actually preventing effectuation of Congressional intent as provided in § 2000d–1.[35] Therefore, the *Leedom* exception obtains herein, and this Court is not precluded by the exhaustion doctrine from assuming jurisdiction over the within controversies.[36]

**34.** The Court recognizes that compelling a programmatic breakdown prior to hearing herein decreases defendant's ability to wield a $65,-000,000 or $23,000,000 sledgehammer. However, that result appears to be a necessary concomitant of protecting the innocent beneficiary of federal funding.

\* \* \* \* \* \*

**35.** Though this Court is unconcerned with the motivations behind HEW's arbitrary behavior, we must recognize the presence of outside considerations. First, as described previously, HEW's efforts were, quite properly, provoked by *Adams v. Richardson, supra.* Subsequently, at least an inference can be drawn that HEW was attempting, not merely desegregation of the Maryland systems, but to place Maryland in the position of being the guinea pig for HEW's compliance efforts. This was evidenced by a memorandum of defendant Gerry, wherein he wrote to Secretary Mathews that:

> In any event, the initiation of an enforcement action will greatly assist in building our credibility with other states and with the court [in *Adams*].
>
> The other issue presented is really a symbolic one. If we initiate enforcement action against Maryland we have the option of also deferring the state's eligibility for new Federal funding. As best we can determine, very little money would be affected by such a decision. It would, however, be regarded

## INJURY TO PLAINTIFFS

■ The actions of defendants, if permitted to continue unrestrained, threaten to inflict severe harm on plaintiffs' programs. Unfortunately, not only programs are harmed, but people are harmed, most often the very people the statute was enacted to assist. We turn now to a discussion of the degree of injury to each plaintiff.

### State of Maryland

In Maryland there are sixteen community colleges, seven state colleges, and two state universities which receive, in the aggregate, $65,000,000 in federal funds. (Tr. at 164). This sum, subject of the within controversy, funds a vast assortment of programs within the schools of higher education in the State. A description of the typical schools and programs affected by HEW's actions offers much enlightenment.

Dr. Andrew Billingsley, President of Morgan State University [37] and author of

> by the civil rights groups as a symbol of our sincerity in putting maximum pressure on institutions to voluntarily comply. For these reasons, we recommend in favor of imposing the deferral.

Plaintiffs' Exh. 11, Memorandum dated August 29, 1975, Civil Action No. N–76–1.

Of course, if HEW was acting in this manner, it in itself, would violate Title VI:

> (a) It is the policy of the United States that *guidelines and criteria established pursuant to title VI of the Civil Rights Act of 1964 and section 182 of the Elementary and Secondary Education Amendments of 1966 dealing with conditions of segregation by race, whether de jure or de facto, in the schools of the local educational agencies of any State shall be applied uniformly in all regions of the United States whatever the origin or cause of such segregation.*

42 U.S.C. § 2000d–6 (1970).

**36.** This Court, having reached this conclusion, need not consider whether the second cited exception to exhaustion derived from *Jewel Companies, Inc. v. FTC,* would be applicable here.

**37.** Morgan State University is an excellent, predominately black institution with approximately 12% of its 6,400 student total enrollment non-black.

*Black Families in White America*, testified extensively at the January 1976 hearing to the detrimental effects of HEW's actions on Morgan State University, and on the black community as a whole. Dr. Billingsley indicated that since $4,000,000 of Morgan's $16,000,000 budget was derived from federal funds, the University's existence hinged upon HEW's activities. Continuation of HEW's arbitrary conduct would have the following effect, according to him:

Black people in this country are notoriously low income. About eighty percent of our students are dependent on some type of financial aid so that financial move itself, whatever reason you did it, would have a detrimental effect on Morgan.

It would destroy Morgan University and the other black colleges in the State, and, therefore, it would destroy opportunity for these youngsters to get an education.

Tr. at 196–97.

Dr. James Lee Fisher, President of Towson State College,[38] testified that of the $3,600,000 received in federal government funds, $3,500,000 are granted to students, either directly or indirectly. Dr. Fisher testified that at Towson the minority student would bear the brunt of defendants' behavior, since the *nine* percent minority obtains *fifty-seven* percent of all scholarship, grant and work-study monies. He logically concluded that a loss of funds would have "a disproportionate impact on minority students." "[P]rogress that has been made [in aiding minority students] would be virtually shut off." (Tr. at 204). He further noted:

[T]he thing that I believe that is of the most concern to us is it seems that students are the innocent victims in contention in which they virtually have no voice, that literally thousands

of students and millions of dollars will be affected or could be affected by the issue that in terms of Towson State College is both unfair and unwarranted.

Tr. at 203–04.[39]

Robert C. Brown, Director of Business Services at the Baltimore Campus of the University of Maryland, testified that currently the Baltimore campus receives approximately $24,000,000 in federal funds, being dispersed as follows: School of Medicine, $12,800,000; School of Dentistry, $2,700,000; School of Nursing, $1,600,000; School of Pharmacy, $426,000; and, Baltimore Cancer Research Center, $5,900,000. (Tr. at 213–14). He indicated that the monies were primarily employed for student support, original research, and medical and health care programs. Mr. Brown explicated one such program, the Baltimore Cancer Research Center, which offers treatment and research on lymphatic cancer unavailable elsewhere. The facility serves 37 in-patients per day and 1,000 out-patients per week. Mr. Brown, unequivocally testified that discontinuance of federal funds would doom the Center to immediate closing. (Tr. at 218). Of more importance to the within examination, Mr. Brown also indicated that HEW's actions were presently causing serious problems to the campus. Due to the cloud over the system, he stated it was becoming increasingly difficult to retain and recruit high calibre faculty because these persons frequently engage in federally financed research which has been threatened with discontinuance by HEW. (Tr. at 219–20).

The Associate Director of the Office of Student Aid at the University of Maryland, College Park, Roscoe Elliott Dann, testified that his department receives $7,000,000 in federal funding, of which $2,225,000 goes directly to minority stu-

---

**38.** Towson State College has 14,300 students enrolled and has approximately a nine percent black undergraduate enrollment.

**39.** Ironically, even though Towson State College is included in HEW's sweeping condemna-

tion, Dr. Fisher testified that all HEW officials who visited the campus praised the school's desegregation efforts. Tr. at 204.

dents through student loans, work-study and grants.[40] Again, as the previous witnesses indicated concerning their programs, Mr. Dann testified that HEW's actions inure to the disproportionate detriment of minority students, since those students ostensibly have the greatest vested interest in the continuation of federal funding.

These are just a sample of the institutions and programs receiving federal aid which are under the spectre of defendants' precipitous enforcement proceedings. It is patent by this review that HEW's arbitrary and capricious actions are inimical to the very interests Title VI sought to assure. Furthermore, the beneficiaries under these programs—the cancer victims, disadvantaged students, the ultimate recipients of the health care programs, etc.—should not suffer for the sins of a program not administered in accordance with this Act. For instance, the cancer patients receiving treatment at the Baltimore Center, should not be compelled to face imminent discontinuance of the Center with the concomitant inability to obtain vital treatment, nor should the minority students, many of whom are totally dependent on federal funding, be fearful of loss of government aid due to an agency's misdirected attempts to enforce the Civil Rights Act.

The foregoing illustrates primarily the intangible harm that defendants' actions have precipitated. However, there are also immediate tangible injuries to plaintiffs. For example, due to the defendants' refusal to specify offending programs, the State stands to lose sizable amounts of money by its continuation of the 1974 desegregation plans. For the fiscal year of 1976 alone, the Maryland State Legislature has appropriated $2,300,000 to implement the plan,[41] much of which could be preserved if HEW were to supply some specificity of discriminatory programs. Furthermore, like ripples on a pond, impending loss of up to $65,000,000 seriously disrupts the State's financial condition. Unable to determine whether all, or only some, of the federal funds will be lost, the State's ability to properly budget and appropriate are severely impaired.

In light of the preceding, to force the *entire* system into extensive administrative hearings, with all the inherent costs —money, time, energy, loss of reputation and academic standing—for the errors of a *portion* of that system—creates no less than irreparable injury to plaintiffs, which, in all fairness, cannot be tolerated.

*City of Baltimore.*

Baltimore City, the eighth largest school district in the country, suffers many of the same harmful effects as the State of Maryland from defendants' actions. The bludgeon employed in the City's case is not as great as the one aimed at Maryland, but nevertheless, tremendous—$23,000,000. HEW's actions affect City programs benefitting a wide range of interests and purposes, for example: summer programs for exceptional and socially deprived children; staff development; programs for handicapped children; parent training; library resources; human resources; sickle cell anemia; projects for reading; science, mathematical and vocational education; and work-study for low income students. Here again there is much evidence that HEW's overly broad behavior disproportionately affects the very persons Title VI was enacted to protect. By HEW's sweeping cavalier approach, school officials, faculty members, and school children alike must fear discontinuance of the various programs. As Dr.

---

**40.** The funding breakdown is as follows: National Student Loans, $500,000; College Work-Study, $596,000; Basic Educational Opportunity Grants, $1,500,000; Supplemental Educational Opportunity Grants, $376,000; nursing, $90,000; and, law enforcement, $331,000. The range of small programs receiving federal funds is quite diverse, including such rather unique programs as a Cuban Refugee Loan Fund Program. Tr. at 208.

**41.** The figure for fiscal year 1977 will, in all likelihood, be increased to $3,000,000. *See* Senate Bill 370; House Bill 900.

Pearl Brakett, Assistant Superintendent of the Baltimore City Department of Education, stated:

> There are perhaps two or three areas in which we have seen the impact of this uncertainty. First with the staff being persons who are currently being employed in programs who are doubtful as to their continuance or get feedback to the effect that it might not be continued have a tendency to look elsewhere for positions and they are in a teeter-totter stage of commitment to their job. That would necessarily affect the type of teaching that would go on, the type of leadership that's affected there. It is important that a person who is working on a job be undivided in their attention toward fulfilling the guidelines and anything that affects the morale in a negative fashion would have that impact.
>
> In a second way we have the children who are in those programs who might have been in the pre-kindergarten level now; when there is no clear determination as to whether the progra  that they are subject to being involved in at that age at the grade three will be there or not perhaps forecasts a difference in the future of that youngster.

Tr. at 17–18 [quoted without correction].

This is but one of the many illustrations of the effect of HEW's actions upon the system's finest instructors and most needy students. For instance, the loss of reputation alone, by HEW's unwarranted actions, wreaks severe injury on the City. Grover McCrea, a member of the Baltimore City School Board, when testifying concerning the City's diminished credibility indicated:

> I think we have to look at several things and that is the credibility as far as communities are concerned and the board in terms of education and that is if they get the feeling that we are finally stabilizing our system to move

on I think that communities will get confidence in our school system once again, which is what we are trying to do. And it's very difficult for us to do this with HEW . . . wanting to take us and we are competing against a county that's surrounding us that they are saying are in compliance and, . . . it's a possibility there of students living that close not staying in the City. Plus we also have the parochial schools and, . . . we stand to lose students to either one of those situations. And I think that would hurt us.

Tr. at 36 [quoted without correction].

Moreover, as in the State of Maryland's case, due to defendants' gross approach, the City is confronted with a major dilemma in considering and effectuating a workable budget. Mayor Schaefer set forth their problem:

> You know when you have hanging over your head that you're going to lose $23,000,000 year after year, when you know that it will be almost impossible to make that money up, you just can't withdraw twenty million dollars from the City from an area where HEW funds really directly help the young people that should be helped.
> . . .

Tr. at 67.

Additionally, Baltimore City suffers further injury due to a factor not present in the Maryland case—the deferral of federal funds. As previously described, HEW deferred, in May 1975, all federal funds which the City could ordinarily obtain to supplement existing programs and implement new ones. Though deferral does not affect the level of funding to pre-deferral programs, it does have injurious effects. First, and most obvious, deferral disallows initiation of new innovative programs. Mayor Schaefer testified that this aspect of deferral had the following deleterious effect on the City:[42]

---

**42.** The City has received additional harm by HEW actions which merits mentioning, albeit briefly. The City has been prevented from utilizing programs of the Government which were available before the advent of HEW's actions, for example, the purchase of government surplus. *See*, Tr. at 23, testimony of Benjamin Whitten.

[T]he fact that we were cut off from new programs, that was, in a way, *a disaster to the City,* when you can't continue on getting new things because you are not eligible under federal Funding for programs that are desperately needed for the disadvantaged. . . . [sic]

Tr. at 67–68 [Emphasis added]. The second aspect of deferral causing injury to plaintiffs is the effect of inflation on funds received under the pre-deferral programs. Since the level of funding to these programs remains constant during the deferral, it is elementary that this, over a period of time, results in a net loss in value received. Hence, this loss of actual value, due to HEW's arbitrary deferral, inhibits the City's continuation of the necessary ongoing programs.

It is evident that, like Maryland, Baltimore City suffers severe and irreparable injury by defendants' unwarranted actions which cannot be allowed to continue.

## SOVEREIGN IMMUNITY

█ As a second defense, defendants assert that the doctrine of sovereign immunity bars this action. Doubtless, the doctrine of sovereign immunity would be an available defense if the instant cases sought to enjoin actions of the United States. *See Larson v. Domestic & Foreign Corp.,* 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949); *Land v. Dollar,* 330 U.S. 731, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947). However, the complaints were drawn in such a manner as to avoid any misunderstanding that the acts were solely acts of the officers of HEW, beyond their power and in direct contravention of Title VI of the Civil Rights Act. In such cases—where officials commit unlawful and ultra vires behavior—it is not considered an action against the sovereign and the doctrine of sovereign immunity does not apply. *See Dugan v. Rank,* 372 U.S. 609, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963); *Malone v. Bowdoin,* 369 U.S. 643, 82 S.Ct. 980, 8 L.Ed.2d 168 (1962); *Larson, supra.* As the Court in *Larson* stated:

[W]here the officer's powers are limited by statute, his actions beyond those limitations are considered individual and not sovereign actions. The officer is not doing the business which the sovereign has empowered him to do or he is doing it in a way which the sovereign has forbidden. His actions are *ultra vires* his authority and therefore may be made the object of specific relief. . . .

337 U.S. at 689, 69 S.Ct. at 1461, 93 L.Ed. at 1636.

Since the agents of HEW acted completely ultra vires, and contrary to the statutory mandates, the instant cases are squarely within the rationale of *Larson* and its progeny. Therefore, sovereign immunity does not bar relief being granted to plaintiffs.

## CONCLUSION

After careful consideration of all of the pleadings, exhibits, depositions, evidence, briefs and arguments in these cases, this Court concludes that the officials of the Department of Health, Education and Welfare are acting in contravention of Title VI of the Civil Rights Act of 1964. These individuals have not followed the mandates of the Act in that they have arbitrarily and whimsically failed to attempt to work toward compliance by voluntary means [43] and have vin-

---

**43.** In Baltimore City's case recent Congressional action provides an additional reason to order further negotiations between the parties. On January 28, 1976, Congress enacted Public Law 94–206 (H.R. 8069), 90 Stat. 3 (1976), which *inter alia* prevents HEW–ordered school bussing:

Sec. 209. None of the funds contained in this Act shall be used to require, *directly or indirectly,* the transportation of any student

to a school other than the school which is nearest the student's home, and which offers the courses of study pursued by such student, in order to comply with title VI of the Civil Rights Act of 1964.

*Id.* at 22 (emphasis added).

When HEW and the City negotiated, the standard generally employed was the "nearest-next-nearest" school standard contained in 20 U.S.C. § 1714(a) (1970), Equal Educational Op-

dictively refused to assume a programmatic approach.

Accordingly, the Court requests counsel for the plaintiffs in each of these cases to submit preliminary injunctions requiring the defendants to discontinue administrative enforcement until such time as defendants have, in good faith, specified the programs not in compliance with Sections 2000d and 2000d–1 of Title VI of the Civil Rights Act of 1964, and until the defendants have sought compliance by voluntary means as to each program or activity specified as being in non-compliance, as mandated by the Act.[44]

portunity Act of 1974. Consequently, since Public Law 94–206 would, in all probability, disallow such approach to be taken today, this provides further reason to reconvene the negotiation process.

44. This decision is *not* to be construed as having any bearing on the issue of compliance of the State of Maryland or the City of Baltimore with Title VI. This decision is intended by the Court solely as a mandate to compel the parties to resume negotiations, much in the spirit described by Lt. Governor Blair Lee:

Well, if we are meeting and talking as partners in a worthy enterprise, which would be the case, and when I say partners, I mean partners, two entities with mutual respect for each other and presumably with a measure of intelligence applied on each side, I don't see why we can't get it worked out.
[Tr. at 390–91].