**Juan Carlos MORENO; Juan Pablo Otero; Clare B. Hogg; Renee Otero, Jr., Appellees,**

v.

**UNIVERSITY OF MARYLAND, and John S. Toll, President, University of Maryland, Appellants.**

**No. 80–1400.**

United States Court of Appeals, Fourth Circuit.

Argued Jan. 8, 1981.

Decided March 26, 1981.

David H. Feldman, Robert A. Zarnoch, Asst. Atty. Gen., Baltimore, Md. (Stephen H. Sachs, Atty. Gen. of Maryland, Baltimore, Md., on brief), for appellants.

**218**

James R. Bieke, Washington, D. C. (R. James Woolsey, John Townsend Rich, Alfred L. Scanlan, Shea & Gardner, Washington, D. C., on brief), for appellees.

Before WINTER, RUSSELL, and ERVIN, Circuit Judges.

PER CURIAM:

The President of the University of Maryland appeals from the judgment of the district court ordering him to permit plaintiffs to demonstrate their entitlement to "In-State" status for purposes of tuition and other fees charged by the University and to refund the difference between the "Out-of-State" tuition and fees actually paid by plaintiffs and the "In-State" tuition and fees they would have paid had they been permitted to demonstrate their entitlement thereto since July 13, 1976, the date of the district court's original judgment in their favor. We affirm.

## I.

Plaintiffs represent a class of individuals holding "G–4" visas who attend the University of Maryland. The named plaintiffs are dependents of foreign national employees of the Inter-American Development Bank and the International Bank for Reconstruction and Development. Employees of these development banks and other international organizations, together with their immediate families, are classified as nonimmigrant aliens in this country under 8 U.S.C. § 1101(a)(15)(G)(iv) (1976). Unlike most nonimmigrant aliens, employees of international organizations often reside permanently in the United States; the development banks, for example, are headquartered in Washington, D. C. Plaintiffs reside in the Maryland suburbs of Washington. Unlike most aliens holding immigrant visas, employees of international organizations are exempt from federal and state income taxation, either by treaty (e. g., Agreement Establishing the Inter-American Development Bank art. XI, § 9(b), [1959] U.S.T. 3029, T.I.A.S. No. 4397; Articles of Agreement of the International Bank for Reconstruction and Development

art. VII, § 9(b), 60 Stat. 1440, T.I.A.S. No. 1502 (1945)), or by statute, 22 U.S.C. § 288 (1976). The exemption, however, applies only to "salaries and emoluments" paid by the international organizations. The plaintiffs are subject to federal and state taxation on all other income and to federal, state and local excise, motor vehicle, real estate, retail sales and other taxes and charges.

At the time plaintiffs originally brought this suit in 1975, the University of Maryland had a policy of charging "Out-of-State" students higher tuition and other fees than it charged "In-State" students. It based the determination of "In-State" status on the student's showing of Maryland "domicile." The policy was phrased such that plaintiffs, despite their Maryland residency, could not establish Maryland "domicile," because they were nonimmigrant aliens. Plaintiffs challenged the policy in the district court pursuant to 42 U.S.C. § 1983 (1976) on the grounds that it denied them due process of law and equal protection under the fourteenth amendment and that it interfered with federal prerogatives over international agreements and immigration in violation of the Supremacy Clause of article VI.

The district court granted summary judgment to the plaintiffs on July 13, 1976. Following *Vlandis v. Kline*, 412 U.S. 441, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973), it held that the University's policy of denying "In-State" status to "G–4" nonimmigrant aliens created an "irrebuttable presumption" inconsistent with due process of law because the presumption that the plaintiffs could not establish Maryland "domicile" was not universally true and because University officials refused to permit the plaintiffs to prove "domicile." The court ordered the University officials to allow students with "G–4" visas to demonstrate Maryland "domicile" and thereby to qualify for "In-State" status. It reserved for plenary consideration the question of whether in fact the named plaintiffs could establish "domicile," and determined that it need not consider the plaintiffs' equal protection and

Supremacy Clause claims in view of the due process basis for relief. *Moreno v. University of Maryland*, 420 F.Supp. 541 (D.Md. 1976).[1]

The University president obtained a stay of the district court order pending appeal. In lieu of granting "In-State" status to students with "G–4" visas who could demonstrate Maryland "domicile," the University agreed to refund the difference between the "Out-of-State" tuition and fees the students would actually pay and the "In-State" tuition and fees they would have paid "but for the stay" in the event the district court's order "were finally affirmed on appeal."

We affirmed the district court's order without opinion, *Moreno v. Elkins*, 556 F.2d 573 (4 Cir. 1977), and the University president sought and obtained a writ of certiorari from the Supreme Court. On the merits, the Supreme Court stated that if the plaintiffs could establish Maryland "domicile," *Vlandis v. Kline* would control, and the Court would have to overrule that case to deny them relief. It declined to do so, choosing instead to obtain a possibly dispositive authoritative interpretation of state law. The Court held that federal law did not prevent a "G–4" nonimmigrant alien from establishing "domicile" in this country, and that state law would thus determine the issue. In the absence of Maryland precedent, the Court certified the question of whether Maryland law prohibited "G–4" nonimmigrant aliens from establishing Maryland "domicile" to the Court of Appeals of Maryland. *Elkins v. Moreno*, 435 U.S. 647, 98 S.Ct. 1338, 55 L.Ed.2d 614 (1978).

The Court of Appeals of Maryland answered the question in the negative. It held that neither the exemption from state income taxation enjoyed by "G–4" aliens nor their inability to vote in state elections precluded them from becoming domiciled in Maryland, particularly in view of the Supreme Court's express holding that "G–4" aliens could establish permanent residence in the United States. *Toll v. Moreno*, 284 Md. 425, 397 A.2d 1009 (1979).[2]

While the case was pending before the Maryland court, the University Board of Regents purported to "clarify" its "In-State" status policy by passing a resolution on June 23, 1978, precluding nonimmigrant aliens from qualifying for "In-State" status. The Supreme Court, supplementing its earlier opinion, recognized that the resolution "fundamentally altered the posture of the case," raising new constitutional issues. It remanded the case to the district court "for further consideration in light of our opinion and judgment in *Elkins*, the opinion and judgment of the Maryland Court of Appeals in *Toll*, and the Board of Regents' clarifying resolution of June 23, 1978." *Toll v. Moreno*, 441 U.S. 458, 461–62, 99 S.Ct. 2044, 2045–46, 60 L.Ed.2d 354 (1979).

## II.

On remand, the district court first reviewed the status of the due process issue in the case. It concluded that the Supreme Court's original decision in *Elkins* and the Maryland Court of Appeals' decision in *Toll* established plaintiffs' ability to prove Maryland "domicile." The University's policy prior to June 23, 1978, thus created an impermissible irrebuttable presumption, denying due process of law to the plaintiffs. The district court further held that the University's policy after that date, expressed in the Board of Regents' resolution, no longer created an irrebuttable presumption, because under the University's more restrictive definition, nonimmigrant aliens

---

1. In accordance with *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), the court dismissed the claim against the University itself, holding it to be an agency of the State of Maryland. Plaintiffs did not appeal this dismissal, so we have no occasion to decide whether the University can be sued under § 1983. *Cf. Owen v. City of Independence*, 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980);

*Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Long v. Richardson*, 525 F.2d 74, 77 (6 Cir. 1975).

2. John S. Toll replaced Wilson H. Elkins, the original defendant, as President of the University of Maryland on July 1, 1978.

could never prove "domicile" and qualify for "In-State" status. *Moreno v. Toll*, 480 F.Supp. 1116 (D.Md.1979). For reasons sufficiently stated in the opinion of the district court, we agree that the University's "In-State" status policy denied due process of law to the plaintiffs prior to June 23, 1978.

### III.

■ The district court then considered the University's policy after June 23, 1978, challenged by plaintiffs on the equal protection and Supremacy Clause grounds deferred previously by the court. Applying strict scrutiny to the suspect classification of nonimmigrant aliens, the district court held that the University could not advance an interest sufficiently substantial to justify the policy, and that the application of the policy to plaintiffs denied them equal protection of the laws. The court also held that the policy constituted state interference with the federal prerogative over immigration in violation of the Supremacy Clause. *Moreno v. Toll*, 489 F.Supp. 658 (D.Md.1980). For reasons sufficiently stated in this opinion of the district court, we agree that the University's "In-State" status policy before and after June 23, 1978, is invalid under the Constitution and that the plaintiffs are accordingly entitled to relief.

### IV.

The district court reaffirmed its order enjoining the University president from enforcing the "In-State" status policy as applied to plaintiffs and directing him to permit students with "G–4" visas to demonstrate Maryland domicile. It also ordered the University president to refund the difference between the "Out-of-State" tuition and fees actually paid by those students who could have demonstrated entitlement to "In-State" status since July 13, 1976, the date of the original district court order, and the "In-State" tuition and fees they would have paid had the University not unconstitutionally applied its "In-State" policy to "G–4" nonimmigrant aliens. The refund was ordered pursuant to the University's agreement to pay the tuition and fees dif-

ferential when it obtained a stay of the original district court order of July 13, 1976, pending appeal.

■ The University now argues that this refund violates the eleventh amendment because it represents retrospective relief requiring the payment of state funds. It cites and relies upon *Quern v. Jordan*, 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979), *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), and *Jaqnandan v. Giles*, 538 F.2d 1166 (5 Cir. 1976), *cert. denied*, 432 U.S. 910, 97 S.Ct. 2959, 53 L.Ed.2d 1083 (1977). Those cases recognize, however, that a state can waive its eleventh amendment immunity. The University did so explicitly in this case by agreeing to pay the refunds when it obtained the stay of the original district court order.

■ The University now contends that the original order was vacated, thus freeing it from its obligation. The Supreme Court, however, only vacated the judgment of this court in order to remand the case to the district court for consideration of the "new issues of constitutional law" raised by the policy change promulgated in the Board of Regents' resolution of June 23, 1978. *Toll v. Moreno*, 441 U.S. at 462, 99 S.Ct. at 2046. Contrary to the University's contention, the district court had continuing jurisdiction over this suit because it expressly did not resolve all the issues in the litigation by its original order. The Supreme Court could not have simply affirmed the original order because it provided for injunctive relief possibly no longer relevant in view of the Board of Regents' resolution. This change in the posture of the case was attributable solely to the action of the University. It should not, therefore, provide a basis for excuse of the University's obligation to refund tuition and fee differentials agreed to in order to prevent immediate implementation of the relief ordered by the district court. The price the University paid to stay the injunction of its constitutionally invalid policy was waiver of its eleventh amendment immunity. It has failed to vin-

dicate that policy, so it must pay the refunds to which it agreed.

AFFIRMED.