764 F.Supp. 364 (1991)
Daniel J. PODBERESKY
v.
William E. KIRWAN, President of the University of Maryland at College Park, and the University of Maryland at College Park.
Civ. No. JFM-90-1685.
United States District Court, D. Maryland.
May 15, 1991.
*365 *366 Andrew Baida, Richard A. Weitzner, Office of the Atty. Gen., Educational Affairs Div., Baltimore, Md., for defendants.

MEMORANDUM
MOTZ, District Judge.
Daniel J. Podberesky, a freshman at the University of Maryland at College Park ("UMCP"), challenges UMCP's Benjamin Banneker Scholarship Program. Banneker scholarships are available only to black students, and Podberesky (who is Hispanic) was denied consideration for one. He has sued UMCP and William E. Kirwan, the president of UMCP. Podberesky seeks injunctive and compensatory relief under 42 U.S.C. §§ 1981, 1983 and 2000d. Discovery has been completed, and he and defendants have both moved for summary judgment.

I.

A. The Immediate Controversy

Banneker scholarships currently provide full financial support for four years of study at UMCP. They each have an estimated value of $33,500. They also provide certain other benefits to their recipients, including admission to UMCP's Honors Program, participation in the Scholars Preceptorship Program, and inclusion in the President's Colloquium. The scholarships are awarded each year to black high school seniors on the basis of merit. In the fall of 1990 the minimum eligibility requirements were a 900 SAT score and a 3.0 grade point average. Podberesky met these requirements, having scored 1340 on the SAT exam and having maintained an unweighted grade point average of 3.56. He applied for a Banneker scholarship but was not considered because he is not black. Twenty-eight Banneker scholarships were ultimately awarded to students entering UMCP in the fall of 1990.

B. Background of the Banneker Scholarship Program

The Banneker program is rooted in a protracted controversy between the Office of Civil Rights ("OCR") of the Department of Health, Education and Welfare and the State of Maryland concerning desegregation of Maryland's system of higher education. The story begins in March 1969, when OCR first informed the State that its *367 system of higher education was in violation of Title VI of the Civil Rights Act of 1964. See Mandel v. HEW, 411 F.Supp. 542, 547 (D.Md.1976), aff'd, 571 F.2d 1273 (4th Cir. 1978), cert. denied, 439 U.S. 862, 99 S.Ct. 184, 58 L.Ed.2d 171 (1978); Adams v. Richardson, 356 F.Supp. 92, 94 (D.D.C.1973), modified, 480 F.2d 1159 (D.C.Cir.1973). Over the next six years, Maryland officials submitted three separate plans in an attempt to comply with Title VI. The first two were rejected in 1970 and 1973, respectively. See Mandel, 411 F.Supp. at 547-48. On December 15, 1975 the Acting Director of OCR decisively rejected the third plan. He wrote to Governor Mandel that "the State of Maryland, its agencies and its state-operated institutions of higher education are not operating in compliance with Title VI of the Civil Rights Act of 1964" and advised the Governor that he was preparing to commence formal enforcement proceedings. See Mandel, 411 F.Supp. at 550.
In response, the State of Maryland obtained an injunction ordering OCR to seek voluntary compliance before initiating enforcement proceedings. See id. In 1980 the State voluntarily submitted a fourth compliance plan to OCR. OCR and the State continued negotiating and in 1985 the State submitted yet a fifth plan (the "1985-89 Plan"). On June 3, 1985 OCR accepted the 1985-89 Plan as "compliance with Title VI for the life of the plan" and entered into a stipulation of dismissal of the Mandel litigation.
The 1985-89 Plan expired in June 1990. Maryland officials are currently preparing for an OCR inspection to determine whether the State is finally in compliance with Title VI. Until this OCR inspection is completed  and until OCR notifies the State that it is finally in compliance with Title VI  the State has stated its intention to continue to abide by the 1985-89 Plan. The State anticipates that the final OCR review will not be completed for two to three years.
The Banneker program was established in 1979 as part of the State's effort to achieve Title VI compliance. Although neither the 1980 plan nor the 1985-89 plan explicitly refer to the program, both plans emphasize the need to increase "other race grants," a generic name for scholarships, such as the Banneker program, aimed at increasing the representation of historically underrepresented racial groups at public higher education institutions in Maryland.

II.
I must resolve several preliminary issues before addressing the merits of Podberesky's claims.

A. Standing

Defendants first contend that Podberesky's claim for injunctive relief is not justiciable under Article III because he lacks standing to assert it. The Supreme Court has articulated three elements of standing: injury, causation, and redressability. "[A]t an irreducible minimum, Art. III requires the party who invokes the court's authority to `show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant,' and that the injury `fairly can be traced to the challenged action' and `is likely to be redressed by a favorable decision.'" Valley Forge Christian College v. Americans United for Separation of Church & State, Inc., 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (citations omitted); see also Allen v. Wright, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). Each of these elements is satisfied in this case.
In order to satisfy the first element, Podberesky must have suffered a "distinct and palpable injury," Warth v. Seldin, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975), one that is "`real and immediate,' not `conjectural' or `hypothetical.'" City of Los Angeles v. Lyons, 461 U.S. 95, 102, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983) (citations omitted). Denial of an equal opportunity for consideration for a benefit or privilege can give rise to an injury conferring standing. For example, in Regents of Univ. of Cal. v. Bakke, 438 U.S. 265, 280-81 n. 14, 98 S.Ct. 2733, 2742-43 *368 n. 17, 57 L.Ed.2d 750 (1978) (Powell, J.), the plaintiff's injury lay "in the University's decision not to permit [him] to compete for all 100 places in the [Medical School] class, simply because of his race.... Hence the constitutional requirements of Art. III were met." See also Sharif v. New York State Educ. Dep't, 709 F.Supp. 345, 356 (S.D.N.Y.1989); C. Wright, A. Miller & E. Cooper, Federal Practice & Procedure § 3531.4, at 430 (1984) ("loss of opportunity may constitute injury, even though it is not certain that any benefit would have been realized if the opportunity had been accorded"). Here, Podberesky unquestionably was denied an equal opportunity to compete for a Banneker scholarship, solely because of his race.
Second, Podberesky's injury must be "fairly traceable to the Government conduct [he challenges] as unlawful." Allen, 468 U.S. at 737, 104 S.Ct. at 3317. The causation element is also clearly satisfied in this case. Podberesky was denied consideration for a Banneker scholarship because of his race; in this case he challenges the Banneker program's racially exclusive eligibility requirement.
Finally, Podberesky's injury must be "likely to be redressed by a favorable decision." Simon v. Eastern Ky. Welfare Rights Org., 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976). In other words, he must "stand to profit in some personal interest" if this court ultimately rules in his favor. Id. at 39, 96 S.Ct. at 1924. In Simon the plaintiffs lacked standing because it was "purely speculative" whether a favorable ruling would lead to any meaningful relief for them. Id. at 42, 96 S.Ct. at 1926. Similarly, in City of Los Angeles v. Lyons, 461 U.S. 95, 105, 103 S.Ct. 1660, 1666, 75 L.Ed.2d 675 (1983), the Court ruled that a person who had allegedly been subjected to an unconstitutional chokehold administered by the Los Angeles Police Department lacked standing to seek injunctive relief prohibiting the use of chokeholds in the future because he was unable to demonstrate that he was under a "real and immediate threat" of again enduring mistreatment at the hands of the police.
Defendants argue that this case is directly analogous to Lyons. They point out that by virtue of a provision which Podberesky does not challenge, the Banneker program is open only to high school seniors. Podberesky has already enrolled at UMCP, and he will never again be in a position to be considered for a Banneker scholarship. Thus, argue the defendants, there is no threat whatsoever that he will be the victim of discrimination in the awarding of future Banneker scholarships.
While defendants' analysis is correct as far as it goes, it does not go far enough. As discussed in Section II B, infra, a denial of equal opportunity can be redressed by closing the opportunity to all persons as well as by extending it to plaintiff. Thus, if Podberesky was unlawfully denied consideration for a Banneker scholarship, he may seek a judicial mandate withdrawing the scholarships from those who have received them even if it would be inappropriate for the court to order that one be granted to him. See Heckler v. Mathews, 465 U.S. 728, 740, 104 S.Ct. 1387, 1395, 79 L.Ed.2d 646 (1984).

B. Scope of Available Relief Under Title VI

Podberesky seeks both prospective and compensatory equitable relief under Title VI, 42 U.S.C. § 2000d.[1] It is clear that under Title VI prospective relief is available to private plaintiffs in appropriate cases. See Guardians Ass'n v. Civil Serv. Comm'n, 463 U.S. 582, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983). Although Guardians is somewhat difficult to decipher, it likewise appears clear that as a general matter compensatory equitable relief may be awarded to private plaintiffs under Title VI. See Consolidated Rail Corp. v. Darrone, 465 U.S. 624, 630, 104 S.Ct. 1248, *369 1252, 79 L.Ed.2d 568 (1984) ("in Guardians ... a majority of the Court expressed a view that a private plaintiff under Title VI could recover back pay") (unanimous opinion).
The question of whether such relief can be granted absent a bad faith violation of the statute is somewhat murkier. Guardians appeared to hold that plaintiffs need not show bad faith in order to obtain compensatory relief, but this point is not entirely free from doubt. Four Justices clearly would have placed no restrictions upon the equitable relief to which a prevailing plaintiff is entitled under Title VI. 463 U.S. at 624-34, 103 S.Ct. at 3244-49 (Marshall, J.); id. at 635-39, 103 S.Ct. at 3250-52 (Stevens, J.; Brennan, J.; and Blackmun, J.). However, two of the Justices stated the view that only a knowing and intentional violation of Title VI can give rise to compensatory equitable relief, id. at 597, 103 S.Ct. at 3230 (White, J. and Rehnquist, J.), and two other Justices expressed no opinion on the question. Id. at 607-11, 103 S.Ct. at 3235-37 (Powell, J. and Burger, C.J.). Although the ninth Justice (Justice O'Connor) appeared to agree with the four who would have placed no restrictions upon the right to equitable relief, her position was not pellucid.[2]Id. at 612, 103 S.Ct. at 3237-38.
I need not decide the question here in light of the fact that, as stated infra, I find that the Banneker program does not violate Title VI. Furthermore, even if I were so to find, I would not exercise my equitable powers to grant Podberesky any compensatory equitable relief. Since the Banneker program was established solely for the purpose of recruiting and retaining black students at UMCP and since Podberesky is not black, to award him the functional equivalent of a Banneker scholarship would be to grant him a benefit to which he never would have been entitled. See Heckler v. Mathews, 465 U.S. 728, 739 n. 5, 104 S.Ct. 1387, 1395 n. 5, 79 L.Ed.2d 646 (1984) (quoting Califano v. Westcott, 443 U.S. 76, 94, 99 S.Ct. 2655, 2666, 61 L.Ed.2d 382 (1979)) (observing that "a court should not, of course, `use its remedial powers to circumvent the intent of the legislature'").
This is not a case where a plaintiff was deprived of the opportunity to attend an institution to which it is likely that he would have been admitted but for an unlawful racial preference. Cf. Regents of Univ. of Cal. v. Bakke, 438 U.S. 265, 320, 98 S.Ct. 2733, 2763, 57 L.Ed.2d 750 (1978) (Powell, J.). Nor it is a case where pre-existing scholarship funds were diverted from general usage to the benefit of a particular minority group. Therefore, assuming that Banneker scholars have received something which they should not have received, this does not ipso facto mean that Podberesky is entitled to receive the same benefits which have been conferred upon them. Rather, if the Banneker program is unlawful, the appropriate relief would be to enjoin its continued existence. See Heckler, 465 U.S. at 740, 104 S.Ct. at 1395 (holding that when a court finds an equal protection violation, "the appropriate remedy is a mandate of equal treatment, a result that can be accomplished by withdrawal of benefits from the favored class as well as by extension of benefits to the excluded class"); C. Wright, A. Miller & E. Cooper, supra, § 3531.6 at 486-87.

C. Scope of Available Relief Under 42 U.S.C. §§ 1981 and 1983

The parameters of Podberesky's cognizable claims under 42 U.S.C. § 1983 *370 can be clearly delineated. He has no claim against UMCP because, as he concedes, UMCP is an arm of the state and states are not "persons" within the meaning of § 1983. See Will v. Michigan Dep't of State Police, 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989); Bickley v. University of Md., 527 F.Supp. 174, 182 (D.Md. 1981). He likewise may not seek monetary damages from Kirwan since he is suing Kirwan only in his official capacity. Will, 109 S.Ct. at 2311. He may, however, seek prospective relief against Kirwan under § 1983 because a suit for injunctive relief against a state official is not treated as a suit against the state. Id. at n. 10; Ex parte Young, 209 U.S. 123, 159-60, 28 S.Ct. 441, 453-54, 52 L.Ed. 714 (1908).
Podberesky's § 1981 claims raise the question of whether entitlement to a scholarship is a "contract" right within the meaning of the section. The answer to this question is not self-evident. However, assuming that § 1981 covers scholarship benefits (and assuming that § 1981 extends to states)[3], Podberesky has failed to establish that defendants have waived their Eleventh Amendment immunity. Thus, like his § 1983 claim, Podberesky's § 1981 claim can give rise only to prospective injunctive relief.[4]
The only evidence to which he points in seeking to demonstrate that an Eleventh Amendment waiver has occurred is a letter to his counsel dated August 1, 1990 from the assistant attorney general representing defendants in this action. That letter provides that Podberesky's UMCP bill will "not be due and payable if the University awards plaintiff a full-financial support scholarship as a result of an order of the Court." In return, Podberesky agreed not to seek a temporary restraining order or a preliminary injunction and not to file an action in any other court until the issuance of a final judgment by this Court.
Podberesky cites Moreno v. University of Md., 645 F.2d 217 (4th Cir.1981), aff'd sub nom. Toll v. Moreno, 458 U.S. 1, 102 S.Ct. 2977, 73 L.Ed.2d 563 (1982) in support of his waiver argument. In Moreno the district court found that the University of Maryland's rules for awarding in-state tuition violated the constitutional rights of non-immigrant aliens. It ordered the University to alter its policy in the future. Moreno v. University of Md., 420 F.Supp. 541, 565 (D.Md.1976). The University obtained a stay of the district court's order pending appeal. It did so by promising to refund the difference between in-state and out-of-state tuition for all non-immigrant *371 aliens from the date of the district court's order if that order was "finally affirmed on appeal." Moreno, 645 F.2d at 219. Some years later, after proceedings in the Supreme Court, the district court's ruling was affirmed, though on different grounds. When the plaintiff class sought a refund in accordance with the agreement which had been reached, the University tried to raise the Eleventh Amendment as a defense. In a per curiam opinion, the Fourth Circuit rejected the University's argument. It held that by representing that it would refund the contested tuition payments in the event of an adverse result on appeal, the University had waived its Eleventh Amendment immunity. Id. at 220. See also Vargas v. Trainor, 508 F.2d 485, 492 (7th Cir.1974), cert. denied, 420 U.S. 1008, 95 S.Ct. 1454, 43 L.Ed.2d 767 (1975) ("[a] representation made in a judicial proceeding for the purpose of inducing the court to act or refrain from acting satisfies the [waiver] requirements").
In the present case the State has made no representation to the court concerning the forgiveness of Podberesky's UMCP bill. Moreover, in Moreno the University had not raised any Eleventh Amendment claim during the pendency of the stay. In contrast, in the present case defendants have actively litigated their immunity defense. Thus, the clear intent and meaning of the August 1, 1990 letter agreement was that the University would forgive Podberesky's UMCP bill if (but only if) I were to reject its Eleventh Amendment immunity defense and otherwise rule against it.

III.
Turning now to the merits, I will assess Podberesky's claims under each of the three statutes he invokes.

A. Title VI
In Guardians the Supreme Court held that Title VI is coextensive with the Fourteenth Amendment. 463 U.S. 582, 610-11, 103 S.Ct. 3221, 3236-37 (1983) (Powell, J.); id. at 612, 103 S.Ct. at 3237-38 (O'Connor, J.); id. at 639-42, 103 S.Ct. at 3252-54 (Stewart, J.). Thus, the Banneker program must be evaluated under the equal protection cause of the Fourteenth Amendment.
Perhaps the central principle to emerge from the Supreme Court's affirmative action cases is that courts must apply strict scrutiny to affirmative action plans implemented by state actors.[5]City of Richmond v. J.A. Croson Co., 488 U.S. 469, 109 S.Ct. 706, 721-23, 102 L.Ed.2d 854 (1989) (O'Connor, J.); id., 109 S.Ct. at 735 (Scalia, J.); Wygant v. Jackson Bd. of Educ., 476 U.S. 267, 273, 106 S.Ct. 1842, 1846, 90 L.Ed.2d 260 (Powell, J.); Regents of Univ. of Cal. v. Bakke, 438 U.S. 265, 291, 98 S.Ct. 2733, 2748, 57 L.Ed.2d 750 (Powell, J.). This is so despite the fact that affirmative action may be motivated by benign intentions, see, e.g., Croson, 109 S.Ct. at 721 (O'Connor, J.), and that affirmative action may burden members of the white "majority." See, e.g., id.; Bakke, 438 U.S. at 295-99, 98 S.Ct. at 2750-53 (Powell, J.). To survive strict scrutiny, an affirmative action plan must serve "`a compelling governmental interest'" and be "`narrowly tailored to the achievement of that goal.'" Wygant, 476 U.S. at 274, 106 S.Ct. at 1847 (Powell, J.) (quoting Palmore v. Sidoti, 466 U.S. 429, 432, 104 S.Ct. 1879, 1881, 80 L.Ed.2d 421 (1984) and Fullilove v. Klutznick, 448 U.S. 448, 480, 100 S.Ct. 2758, 2775, 65 L.Ed.2d 902 (1980)). See also Croson, 109 S.Ct. at 721 (O'Connor, J.).

1. Does the Banneker program serve a compelling governmental interest?
In this case, the defendants argue that the Banneker program serves the "compelling" *372 goal of remedying the effects of past discrimination at UMCP.[6] Podberesky concedes that this is a constitutionally permissible goal, and in fact the Supreme Court has repeatedly held that states may adopt race-conscious remedies to counteract the effects of past discrimination. See, e.g., Croson, 109 S.Ct. at 727; id., 109 S.Ct. at 729 (O'Connor, J.) (noting, however, that such remedies are available only "[i]n the extreme case"); id., 109 S.Ct. at 734 (Kennedy, J.) (similar proviso); United States v. Paradise, 480 U.S. 149, 166-67, 107 S.Ct. 1053, 1063-64, 94 L.Ed.2d 203 (1987) (Brennan, J.); Wygant, 476 U.S. at 277, 106 S.Ct. at 1848 (Powell, J.); Bakke, 438 U.S. at 307, 98 S.Ct. at 2757 (Powell, J.); id., 438 U.S. at 325, 98 S.Ct. at 2766 (Brennan, J.). See also Uzzell v. Friday, 625 F.2d 1117, 1121 (4th Cir.1980).
To survive strict scrutiny, there must be evidence of past discrimination in the specific context which the challenged program aims to remedy. Croson underscores the fact that a general history of societal discrimination, standing by itself, cannot justify state-imposed affirmative action. Croson, 109 S.Ct. at 723; see also Wygant, 476 U.S. at 276, 106 S.Ct. at 1848 (Powell, J.). As the Supreme Court observed in Croson, "a generalized assertion that there has been past discrimination in an entire industry ... `has no logical stopping point'" and could lead to a society built around rigid racial quotas. Croson, 109 S.Ct. at 723 (quoting Wygant, 476 U.S. at 275, 106 S.Ct. at 1847 (Powell, J.)).
In this case, the defendants do not attempt to justify the Banneker program by pointing to a general history of societal discrimination. Instead, they argue that the Banneker program is necessary to remedy the effects of past discrimination at UMCP. The question thus becomes whether UMCP has demonstrated with sufficient particularity that it has a history of racial discrimination which can justify the Banneker program's existence. The evidentiary showing necessary to sustain a claim of past discrimination was one issue which commanded a majority in Croson. Under Croson, proponents of affirmative action must satisfy a rigorous evidentiary burden: there must be "`a strong basis in evidence for [a] conclusion that remedial action is necessary.'" Id., 109 S.Ct. at 724 (quoting Wygant, 476 U.S. at 277, 106 S.Ct. at 1849 (Powell, J.)).[7]
In this case, the defendants rely on OCR's findings to satisfy the Croson burden. The plurality opinion in Croson supports the premise of this argument: "for the governmental interest in remedying past discrimination to be triggered `judicial, legislative, or administrative findings of constitutional or statutory violations' must be made." Croson, 109 S.Ct. at 723 (O'Connor, J.) (quoting Bakke, 438 U.S. at 307, 98 S.Ct. at 2757 (Powell, J.)). Although not accepted by five Justices in Croson, this standard comports with the spirit underlying the majority opinion.[8] Thus, if in this case the federal government has made sufficient findings of statutory violations at UMCP, the Banneker program may be viewed as serving the "compelling" purpose of remedying past discrimination.
The historical record discussed in Section I B, supra, makes it abundantly clear that there is a history of past discrimination at UMCP. The defendants have produced an overwhelming compilation of *373 historical evidence, replete with administrative findings, protracted litigation, and continuing OCR review of UMCP's efforts. Although the 1985-89 Plan was accepted as compliance with Title VI during its life, OCR still has not certified that Maryland is in final compliance with Title VI. If ever there was an administrative record demonstrating past discrimination, this is it. Cf. Valentine v. Smith, 654 F.2d 503 (8th Cir. 1981), cert. denied, 454 U.S. 1124, 102 S.Ct. 972, 71 L.Ed.2d 111 (1981) (similar history justified race-conscious hiring at Arkansas State University); Zaslawsky v. Board of Educ., 610 F.2d 661 (9th Cir.1979) (similar history justified staff integration plan in Los Angeles public schools).
Podberesky makes a number of arguments to the contrary. First, he contends that "no Federal agency has ever found that Maryland operated a racially segregated system of higher education in violation of Federal law." This contention is simply contrary to the factual record.
Second, he argues that OCR's findings are insufficient to demonstrate a history of discrimination. According to Podberesky, a "court or agency administrative body" would need to find noncompliance in order to satisfy Croson's evidentiary standard. This argument has far-reaching implications. If it were accepted, a violator of Title VI would be required to engage in extended litigation in order to insulate any remedial program from subsequent challenge  even if it accepted its obligation to stop violating Title VI. This might present Article III problems under the "feigned case" doctrine, and it certainly would be a waste of judicial resources. Moreover, it flies in the face of Title VI's policy favoring voluntary compliance. See 42 U.S.C. § 2000d-1; see also Wygant v. Jackson Bd. of Educ., 476 U.S. 267, 289-91, 106 S.Ct. 1842, 1854-56, 90 L.Ed.2d 260 (1986) (O'Connor, J.).
In addition, the rationale behind the Croson decision does not support Podberesky's contention. According to the Croson plurality, "the purpose of strict scrutiny is to `smoke out' illegitimate uses of race." City of Richmond v. J.A. Croson Co., 488 U.S. 469, 109 S.Ct. 706, 721, 102 L.Ed.2d 854 (1989). Where an affirmative action plan is adopted in response to a federal agency's determination, it is unlikely that a state is attempting to advance any "illegitimate uses of race." On the contrary, the state is merely responding to a federally-imposed mandate. Thus, Podberesky's argument finds no support in the theory that animated Croson.[9]
Third, Podberesky argues that OCR's conclusion that the State of Maryland violated Title VI was premised on an erroneous interpretation of the law, and therefore has no validity. Specifically, he contends that OCR misapprehended both the definition of "program or activity" under Title VI and the necessity of affirmative remedies for past constitutional violations. His first point is meritless in light of 42 U.S.C. § 2000d-4a, which legislatively overruled Grove City College v. Bell, 465 U.S. 555, 104 S.Ct. 1211, 79 L.Ed.2d 516 (1984), and restored a broad definition of Title VI's "program or activity" standard. Likewise, assuming that OCR did err in taking the position that a university has the obligation to undertake affirmative action to remedy equal protection violations, see Ayers v. *374 Allain, 914 F.2d 676, 687 (5th Cir.1990), cert. granted sub nom. United States v. Mabus, ___ U.S. ___, 111 S.Ct. 1579, 113 L.Ed.2d 644 (1991) that is not the issue in this case. The Banneker program was not imposed on UMCP; UMCP voluntarily agreed to it and is now defending it as its own. The constitutionality of the program is, therefore, not dependent on whether a court or OCR can require affirmative remedies for a Title VI violation. Cf. Geier v. Alexander, 801 F.2d 799, 805 (6th Cir.1986) (noting that no "case has held, or even hinted that affirmative remedies are not available to remove the vestiges of past unlawful segregation") (emphasis added). Its constitutionality is governed by the standard set forth in Croson: whether UMCP possesses a "strong basis in evidence" for the conclusion that there is a history of discrimination at UMCP.
Fourth, Podberesky asserts that no federal official has ever approved the Banneker program. Even if this assertion is correct  which does not appear to be the case  it is largely irrelevant.[10] The question under Croson is simply whether there is a "strong basis in evidence" sufficient to justify affirmative race-based remedies for past discrimination. This question is to be resolved in the final instance by the courts, not OCR administrators. Accord United States v. Paradise, 480 U.S. 149, 107 S.Ct. 1053, 94 L.Ed.2d 203 (1987) (affirmative action plan upheld despite Department of Justice's opposition); Geier v. Alexander, 801 F.2d 799 (6th Cir.1986) (same).
Fifth, Podberesky argues that time has nullified the force of OCR's past findings of discrimination. He contends that even if OCR's findings could, in the past, have justified the Banneker program, UMCP is now free from discrimination. Thus, he concludes, the continued presence of affirmative action at UMCP is little more than an unconstitutional anachronism.
This argument raises an apparently unsettled legal question: the Supreme Court's affirmative action cases do not directly address the question of when past discrimination ceases to justify present remedies.[11] It seems obvious, as Justice O'Connor stated in Wygant v. Jackson Bd. of Educ., 476 U.S. 267, 286, 106 S.Ct. 1842, 1853, 90 L.Ed.2d 260 (1986), that evidence of a remedial purpose "need not be accompanied by contemporaneous findings of actual discrimination to be accepted as legitimate." See also id. at 289-91, 106 S.Ct. at 1854-56. To require such findings would be inconsistent with the very notion that past discrimination can justify present affirmative action. Beyond this truism, the standard seems to be that there must be *375 continuing effects of past discrimination to justify a race-conscious remedy. See, e.g., City of Richmond v. J.A. Croson Co., 488 U.S. 469, 109 S.Ct. 706, 720, 102 L.Ed.2d 854 (1989) (O'Connor, J.) (states have authority "to rectify the effects of identified discrimination") (emphasis added); Wygant v. Jackson Bd. of Educ., 476 U.S. 267, 280, 106 S.Ct. 1842, 1850, 90 L.Ed.2d 260 (1986) (Powell, J.) (race may be taken into account "to remedy the effects of prior discrimination) (emphasis added); Regents of Univ. of Cal. v. Bakke, 438 U.S. 265, 307, 98 S.Ct. 2733, 2757, 57 L.Ed.2d 750 (1978) (Powell, J.) (affirming a state's interest in "ameliorating, or eliminating where feasible, the disabling effects of identified discrimination") (emphasis added). Thus, the question becomes whether present effects of past Title VI violations remain in evidence at UMCP.
Podberesky offers some evidence that they do not. He points out that in 1989, UMCP exceeded its goal for recruiting black freshmen and came close to meeting its goal for retention of black undergraduates. In addition, President Kirwan testified on deposition that UMCP has not discriminated against blacks in admission or financial aid for many years. Nevertheless, the effects of longstanding discrimination are pervasive, and there is ample evidence in the record before me to support the view of UMCP officials that it is premature to find that there are no present effects of past discrimination at the institution. OCR has not yet certified that UMCP is finally in compliance with Title VI, and it is prudent for the University's officials to let OCR's evaluation run its course provided that this evaluation is concluded within the next several years. Moreover, the Banneker program itself may have been instrumental in meeting the goals for 1989. Although the program funds only a relatively small group of students, Banneker recipients apparently play an active role in the recruiting and retention of other black students. Thus, declaring that the Banneker program is no longer necessary may have the ironic result of awakening the now-dormant specter of past discrimination.
For these reasons, I hold that the Banneker program serves the compelling interest of remedying the present effects of past discrimination.

2. Is the Banneker program "narrowly tailored"?
The remaining question is whether the Banneker program is "narrowly tailored" to serve this interest. The seminal decision on this question is United States v. Paradise, 480 U.S. 149, 107 S.Ct. 1053, 94 L.Ed.2d 203 (1987). There the Court held that remedial plans need not be "`limited to the least restrictive means of implementation.'" Id. at 184, 107 S.Ct. at 1073 (Brennan, J.) (quoting Fullilove v. Klutznick, 448 U.S. 448, 508, 100 S.Ct. 2758, 2790, 65 L.Ed.2d 902 (1980) (Powell, J.)). It identified four criteria by which to judge the nexus between a remedial plan and the interest it purports to serve: "the necessity for relief and the efficacy of alternative remedies; the flexibility and duration of the relief, including the availability of waiver provisions; the relationship of the numerical goals to the relevant labor market; and the impact of the relief on the rights of third parties." Id., 480 U.S. at 171, 107 S.Ct. at 1066 (Brennan, J.).
In this case the defendants argue that the Banneker program is necessary for the recruitment and retention of black students, both of which are central features of the 1985-89 Plan. They have produced unrebutted evidence that although the Banneker program reaches only a small number of students, Banneker scholars play an important role in recruiting other black applicants and in retaining black students. This evidence demonstrates that the Banneker program is an effective means of achieving the purpose of remedying past discrimination at UMCP.
The defendants have considered alternatives to the Banneker program, and have concluded that they would be ineffective. For example, a race-blind merit-based scholarship program would "result in a minimal number of such awards made to blacks" because, according to UMCP's unrebutted evidence, black students generally *376 do not perform as well as white students on standardized tests such as the SAT. Similarly, a merit-based scholarship program which took applicants' races into account (as opposed to requiring that applicants be black) would be ineffective at serving blacks unless the racial preference were so strong as to be virtually indistinguishable from the Banneker program. And a program aimed at other non-white students would merely dilute UMCP's efforts to remedy past discrimination against blacks, and would in fact bear no relation whatsoever to past discrimination. Cf. City of Richmond v. J.A. Croson Co., 488 U.S. 469, 109 S.Ct. 706, 728, 102 L.Ed.2d 854 (1989) (fact that program was aimed at "Spanish-speaking, Oriental, Indian, Eskimo, or Aleut persons ... suggests that perhaps the [defendant's] purpose was not in fact to remedy past discrimination"). Thus, the Banneker plan satisfies the first Paradise factor.
The second prong of the Paradise test demands examination of the "flexibility and the duration of the relief." Paradise, 480 U.S. at 171, 107 S.Ct. at 1066 (Brennan, J.). The Banneker program is not very flexible. UMCP apparently has a policy of awarding at least twenty Banneker scholarships a year, although UMCP denies having any fixed minimum number of Banneker awards in any one year. And the program, of course, is only open to blacks. As for duration, UMCP has not stated precisely how long it envisions maintaining the Banneker program. It has only stated its intention to continue the program at least through the completion of the OCR review. Certainly an indefinite program would violate the equal protection clause. However, as indicated above, at least until OCR has determined that UMCP is in compliance with Title VI, the Banneker program's continuing existence does not offend the Constitution. Cf. Kromnick v. School Dist. of Philadelphia, 739 F.2d 894, 904 (3d Cir. 1984) (withdrawal of OCR-imposed desegregation obligation not dispositive in constitutional analysis).
Third, Paradise raises "the relationship of the numerical goals to the relevant labor market." Paradise, 480 U.S. at 171, 107 S.Ct. at 1066 (Brennan, J.). In the context of this case, this factor raises the question whether too many Banneker scholarships are granted. In light of the history of unlawful discrimination at UMCP, there is absolutely no basis on which to draw such a conclusion.
Finally, Paradise calls for an examination of the "impact of the relief on the rights of third parties." Id. Podberesky makes much of this point, arguing that the program siphons money away from scholarship programs for which he, as a nonblack, would be eligible. This argument is unpersuasive. For one thing, it is factually unsupported. The record reveals that at least some of the Banneker program's funding would simply be redirected to other means of recruiting and retaining black students were the program invalidated, and there is no evidence that it would be used for additional scholarships for the general student population. Even if it were assumed that the Banneker funding would be used for that purpose, there is no evidence that the eligibility requirements for any general scholarship would be ones which Podberesky could meet. More generally, the Banneker program imposes a relatively diffuse burden on non-black students. They have numerous other sources of needand merit-based financial aid at UMCP, so that the presence of the Banneker program does not wreak substantial hardship on any individual. See Wygant v. Jackson Bd. of Educ., 476 U.S. 267, 283 & n. 11, 106 S.Ct. 1842, 1852 & n. 11, 90 L.Ed.2d 260 (1986) (Powell, J.). While a scholarship is certainly a desirable benefit, the denial of one does not create a burden analogous to a lay-off, which violates a reliance interest in continued employment. Cf. id. at 282-84, 106 S.Ct. at 1851-52; Paradise, 480 U.S. at 182-83, 107 S.Ct. at 1072-73.

B. §§ 1981 and 1983
The conclusions reached above with regard to Podberesky's Title VI claim dictate that his 42 U.S.C. §§ 1981 and 1983 claims must also fail. Although § 1981, which guarantees equal rights to "make and enforce contracts," has a different *377 scope than the Fourteenth Amendment in that it reaches private conduct, see, e.g., Patterson v. McLean Credit Union, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), it has been held that § 1981 does not prohibit affirmative action programs which pass constitutional muster. This is so because § 1981 has a legislative history which, though very complex, is intertwined with that of the Fourteenth Amendment. See, e.g., Runyon v. McCrary, 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976) (lengthy discussion of § 1981's legislative history). As the Sixth Circuit put it in Detroit Police Officers' Ass'n v. Young, 608 F.2d 671, 692 (1979), cert. denied, 452 U.S. 938, 101 S.Ct. 3079, 69 L.Ed.2d 951 (1981) "The constitutional genesis of § 1981 ... means that what the Constitution permits, § 1981 must also permit." See also Valentine v. Smith, 654 F.2d 503, 512 (8th Cir.1981), cert. denied, 454 U.S. 1124, 102 S.Ct. 972, 71 L.Ed.2d 111 (1981); Local 35, Int'l Brotherhood of Elec. Workers v. City of Hartford, 625 F.2d 416, 425 (2d Cir.1980), cert. denied, 453 U.S. 913, 101 S.Ct. 3148, 69 L.Ed.2d 997 (1981).
As for Podberesky's § 1983 claim, it can serve in this case only as a vehicle to enforce underlying rights guaranteed by the Fourteenth Amendment, Title VI, or § 1981. Since the defendants are entitled to summary judgment under each of these statutes, the § 1983 claim necessarily fails as well.

IV.
In addition to his claims concerning the Banneker program, Podberesky mounts a weak challenge to UMCP's Francis Scott Key scholarship program, which offers racially neutral merit-based full-support scholarships. Podberesky sought a Key scholarship, but was deemed ineligible by virtue of a numerical "predictive index" calculated from his SAT score and high school grade point average. His predictive index fell below a minimum cut-off established by UMCP authorities for consideration for a Key scholarship. Although he offers a number of arguments why the Key program violates Title VI, none of them is even remotely plausible.
First, he challenges the numerical threshold requirement for consideration for a Key scholarship. He argues that the cut-off discriminated against him and others who did not satisfy it. This claim is evaluated under constitutional standards because, as noted above, Title VI is coextensive with the Fourteenth Amendment. Guardians Ass'n v. Civil Serv. Comm'n, 463 U.S. 582, 610-11, 103 S.Ct. 3221, 3236-37, 77 L.Ed.2d 866 (Powell, J.); id. at 612, 103 S.Ct. at 3237-38 (O'Connor, J.); id. at 639-42, 103 S.Ct. at 3252-54 (Stevens, J.). The "relatively relaxed" rational-basis standard of review applies to this particular claim. See Massachusetts Bd. of Retirement v. Murgia, 427 U.S. 307, 314, 96 S.Ct. 2562, 2567, 49 L.Ed.2d 520 (1976).[12] A classification reviewed under the rational-basis standard "is presumed to be valid and will be sustained if [it] is rationally related to a legitimate state interest." City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985).
Here, the eligibility cut-off is plainly related to the legitimate state interest in identifying a manageable pool of qualified Key applicants for further consideration. Although the cut-off may be somewhat arbitrary, it nevertheless manifestly serves a legitimate function in simplifying the administration of the Key program. Murgia, 427 U.S. at 314-17, 96 S.Ct. at 2567-69; Idaho Dep't of Employment v. Smith, 434 U.S. 100, 98 S.Ct. 327, 54 L.Ed.2d 324 (1977).
Second, Podberesky argues that the absence of any Hispanics on the Key selection committee violated Title VI. This argument is unsupported by any evidence indicating *378 that UMCP officials discriminated against Hispanics in forming the Key selection committee. See Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Moreover, assuming that potential Hispanic members of the committee were the victims of discrimination, Podberesky lacks standing to raise this claim. The composition of the committee in no way affected his application for a Key scholarship; he was rejected by the mechanical operation of a racially neutral cut-off. Thus, there is no causal link between the composition of the committee and Podberesky's failure to receive a Key scholarship. See Allen v. Wright, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984).
Third, Podberesky decries UMCP's failure to give Hispanics any special consideration for Key scholarships. This contention is baffling and, in light of his principal contention, at best paradoxical. It appears to advocate unequal treatment of Hispanic Key applicants based solely on their race. As the foregoing discussion of the Banneker program illustrates, such a result would assuredly violate the equal protection clause absent a compelling state interest. Podberesky has failed even to suggest what such an interest might be, much less demonstrate that UMCP should be judicially ordered to adopt a race-conscious Key selection criterion. Cf. Ayers v. Allain, 914 F.2d 676, 687 (5th Cir.1990), cert. granted, ___ U.S. ___, 111 S.Ct. 1579, 113 L.Ed.2d 644 (1991) (university's obligation in remedying equal protection violations is satisfied by "implementing good-faith, race-neutral policies and procedures").
Fourth, Podberesky points out that UMCP officials initially miscalculated his high-school grade point average, resulting in an incorrect predictive index. When apprised of their mistake, the officials recalculated the index. Neither the initial calculation nor the corrected result met the cutoff. Podberesky's remonstrations notwithstanding, this episode does not bespeak discrimination, but only an innocent (and harmless) mistake.
Finally, Podberesky offers statistics in an attempt to proceed under a disparate impact theory. Those statistics reveal that while Hispanics made up 4.2% of the class which entered UMCP in the fall of 1990, only 1.1% of the Key recipients from that class were Hispanic. Assuming that the statistics are accurate, they do not give rise to a cause of action under Title VI; that statute only reaches intentional discrimination. See Guardians Ass'n v. Civil Serv. Comm'n, 463 U.S. 582, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983). Although in Guardians the Court did hold that regulations promulgated under Title VI can give rise to claims of disparate impact, see Alexander v. Choate, 469 U.S. 287, 292-94, 105 S.Ct. 712, 715-16, 83 L.Ed.2d 661 (1985) (restating the holding of Guardians on this issue); Gomez v. Illinois State Bd. of Educ., 811 F.2d 1030, 1044-45 (7th Cir.1987), Podberesky has cited no regulations in his complaint or otherwise attempted to prove any regulatory disparate impact claim. Cf. Sharif v. New York State Educ. Dep't, 709 F.Supp. 345, 360 (S.D.N.Y.1989). (Title IX plaintiff alleged violation of both statute and disparate impact regulations). Thus, his claim fails. Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).
A separate order granting defendants' summary judgment motion is being entered herewith.

ORDER
For the reasons stated in the memorandum entered herein, it is this 15th day of May 1991.
ORDERED.
1. Defendants' motion for summary judgment is granted;
2. Plaintiff's motion for partial summary judgment is denied; and
3. Judgment is entered in favor of defendants against plaintiff.
NOTES
[1] Podberesky has not asserted any claim for damages as such under Title VI. The availability of damages is a separate question from the availability of compensatory equitable relief. See, e.g., Rhodes v. Charter Hosp., 730 F.Supp. 1383, 1385 (S.D.Miss.1989); Bradford v. Iron County C-4 School Dist., 37 Empl.Prac.Dec. (CCH) ¶ 38,610 (E.D.Mo. June 13, 1984).
[2] Justice O'Connor accepted Justice Stevens's analysis of the remedial question: "For reasons given in Part I of the dissent by Justice Stevens, ... I cannot agree with the limitations that Justice White's opinion would place on the scope of equitable relief available to private litigants suing under Title VI." Guardians, 463 U.S. at 612, 103 S.Ct. at 3237-38. In a footnote to that sentence, she declined to "address the question whether there is a private cause of action under Title VI for damages relief." Id. at n. 1. It appears that that footnote is irrelevant to the issue at hand, for the availability of a damages remedy is separate from the question raised by Justice White: a good-faith limitation on retrospective equitable relief under Title VI. Justice O'Connor may well have had independent reasons for declining to address the existence of a damages remedy under Title VI. See Bradford v. Iron County C-4 School Dist., 37 Empl.Prac.Dec. (CCH) ¶ 38,610 (E.D.Mo. June 13, 1984) (concluding that Title VI offers equitable remedies only). Nevertheless, the footnote might possibly be read to evince a broader objection to the granting of compensatory relief.
[3] This assumption may be dubious in light of Jett v. Dallas Indep. School Dist., 491 U.S. 701, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989). There, the Supreme Court held that because a municipality is subject to suit for damages directly under § 1983, it is not subject to suit under § 1981. Although the logic of this holding would not extend to states in light of the holding in Will that states are not "persons" subject to suit under § 1983, the breadth of the language of Jett suggests that no local or state government is subject to suit under § 1981. Id., 109 S.Ct. at 2722 ("§ 1983 ... provides the exclusive federal damages remedy for the violation of the rights guaranteed by § 1981 when the claim is pressed against a state actor"). This result, however, seems to be somewhat paradoxical in light of the fact that Johnson v. Railway Express Agency, 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975); Runyon v. McCrary, 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976); and Patterson v. McLean Credit Union, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989)  which held that § 1981 prohibits racial discrimination in the making and enforcement of private contracts  all proceeded from the unspoken premise that § 1981 applies to public actors. Cf. Jones v. Alfred H. Mayer Co., 392 U.S. 409, 421, 88 S.Ct. 2186, 2193, 20 L.Ed.2d 1189 (1968) ("On its face ... § 1982 appears to prohibit all discrimination against Negroes in the sale or rental of property  discrimination by private owners as well as discrimination by public authorities").

Perhaps this paradox is lessened by the fact that rights created by § 1981 may be enforced by § 1983 suits brought for prospective relief against state officials in their official capacity. See Will, 109 S.Ct. at 2311 n. 10. Furthermore, as discussed in Section III B, infra, it appears to be settled that § 1981 creates no greater substantive right against a state actor than does the Fourteenth Amendment itself (which, of course, is independently enforceable under § 1983).
[4] Podberesky's claim for prospective relief under § 1981 is unaffected by the absence of a waiver of Eleventh Amendment immunity. The Eleventh Amendment bars only those suits seeking retrospective relief. Edelman v. Jordan, 415 U.S. 651, 667, 94 S.Ct. 1347, 1357, 39 L.Ed.2d 662 (1971).
[5] A different standard is used for affirmative action plans implemented by Congress, see Metro Broadcasting, Inc. v. F.C.C., ___ U.S. ___, 110 S.Ct. 2997, 3009, 111 L.Ed.2d 445 (1990) (Congressionally-mandated programs must "serve important governmental objectives within the power of Congress and [must be] substantially related to the achievement of those objectives"), and private employers, see Johnson v. Transportation Agency, 480 U.S. 616, 631, 637, 107 S.Ct. 1442, 1451, 1454, 94 L.Ed.2d 615 (1987) (private employer's plan must seek to redress a "manifest imbalance" in the composition of its work-force and must not "unnecessarily trammel" the rights of others).
[6] Flanagan v. President & Directors of Georgetown College, 417 F.Supp. 377 (D.D.C.1976) is accordingly inapposite. In that case, there was "no showing that defendants were guilty of past discrimination." Id. at 384.
[7] Although this discussion is framed in terms of the defendant's evidentiary burden in showing a past history of discrimination, plaintiffs in affirmative action cases "continue to bear the ultimate burden of persuading the court that the ... evidence [does] not support an inference of prior discrimination and thus a remedial purpose, or that [a] plan ... [is] not sufficiently `narrowly tailored.'" Wygant, 476 U.S. at 293, 106 S.Ct. at 1857 (O'Connor, J.).
[8] More precisely, it may be viewed as a sufficient, but not a necessary means of satisfying the evidentiary burden established by five Justices in Croson. Requiring a past official finding of a constitutional or statutory violation would appear to be more severe than mandating merely a "`strong basis in evidence.'" Croson, 109 S.Ct. at 724 (quoting Wygant, 476 U.S. at 277, 106 S.Ct. at 1849 (Powell, J.)).
[9] Lower courts have generally rejected the notion that judicial or administrative adjudicatory findings of discrimination are necessary to uphold affirmative action plans. See Palmer v. District Bd. of Trustees, 748 F.2d 595, 600 n. 14 (11th Cir.1984); Zaslawsky v. Board of Educ., 610 F.2d 661, 663-64 (9th Cir.1979); Chicago Fire Fighters Union Local 2 v. Washington, 736 F.Supp. 923, 928 (N.D.Ill.1990). Cf. Kromnick v. School Dist., 739 F.2d 894, 905 (3d Cir.1984), cert. denied, 469 U.S. 1107, 105 S.Ct. 782, 83 L.Ed.2d 777 (1985) (court order present, but not necessarily required); Valentine v. Smith, 654 F.2d 503, 509 (8th Cir.1981), cert. denied, 454 U.S. 1124, 102 S.Ct. 972, 71 L.Ed.2d 111 (1981) (same; possibly erroneous interpretation of court order). But cf. Uzzell v. Friday, 625 F.2d 1117, 1120 (4th Cir.1980) (affirmative action may be justified "to redress wrongs worked by adjudicated instances of racial discrimination"; decision predates Croson by over eight years) (emphasis added); Caulfield v. Board of Educ., 632 F.2d 999, 1006 (2d Cir.1980), cert. denied, 450 U.S. 1030, 101 S.Ct. 1739, 68 L.Ed.2d 225 (1981) (OCR finding insufficient to demonstrate need for race-conscious remedy; decision predates Croson by more than eight years).
[10] The 1985-89 Plan commits the State to "review and revise, as appropriate, institutional recruitment plans within 90 days, after acceptance of this plan." OCR's acceptance of the 1985-89 Plan was expressly conditioned on timely receipt of recruitment plans. The Banneker program is mentioned repeatedly in UMCP's recruitment plan submissions.

In the spring of 1985, commenting on UMCP's recruitment plan, OCR advised UMCP to "increase number and amount of existing awards" of "[f]inancial aid (need-based and merit-based) designated for black students." In a subsequent recruiting plan submission, dated May 23, 1985, UMCP informed OCR about the Banneker program (which then provided an annual stipend of $1,000). In late 1986 OCR replied, commenting that the May 23, 1985 recruitment plan "adheres to the monitoring guide ... provided to UMCP by OCR." UMCP's final recruitment plan submission, dated July 1987, also referred to the Banneker program. These documents indicate that OCR certainly knew about the Banneker program, and in fact suggested expanding it in 1985.
In response to this evidence, Podberesky offers a letter written in response to a FOIA request which states that "We [OCR] have not been able to locate any documents ... that contain approval, acceptance, sanction, or requirement [of the Banneker program]." The letter further states that references to the Banneker program contained in certain documents provided in the FOIA request "would not constitute Department of Education approval, acceptance, sanction or requirement" of the program. The defendants argue that this letter is unpersuasive because it was written one day after Podberesky made his FOIA request and fails to address the documents cited above. I agree.
[11] In the recent case of Board of Educ. v. Dowell, ___ U.S. ___, 111 S.Ct. 630, 638, 112 L.Ed.2d 715 (1991), the Supreme Court held that an order desegregating public schools can be vacated when "the vestiges of past discrimination [have] been eliminated to the extent practicable." Dowell is not directly relevant to this case, however, since it concerned an order requiring a school district to desegregate.
[12] Rational-basis review is applied to equal protection claims as a "general rule." City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985). This rule gives way only when distinctions are based on suspect criteria (such as race or gender) or operate to restrict fundamental rights. Id. at 440-42, 105 S.Ct. at 3254-56. These exceptions are not implicated in this case since the threshold eligibility requirement is neutral and impinges upon no recognized fundamental right.